James A. RAMSEY; Elf Atochem North America; Aluminum Company of America; Columbia Aluminum Corporation; Columbia Falls Aluminum Company; Kaiser Aluminum & Chemical Corporation; Intalco Aluminum Corporation; Northwest Aluminum Company; Reynolds Metals Company; Vanalco, Inc., Plaintiffs–Appellants,

v.

Mickey KANTOR,* in his official capacity as Secretary of Commerce; United States Department of Commerce; National Marine Fisheries Service; Pacific Fishery Management Council; Phillip Anderson, in his official capacity as Chairman of the Pacific Fisheries Management Council; North Pacific Fisheries Management Council; Richard B. Lauber, in his official capacity as Chairman of North Pacific Fisheries Management Council; Bruce Babbitt, in his official capacity as the Secretary of the Interior; U.S. Fish & Wildlife; State of Oregon; Rod Ingram, in his official capacity as Acting Director of the Oregon Department of Fish and Wildlife; State of Alaska; Carl L. Rosier, in his official capacity as Commissioner of the Alaska Department of Fish & Game; State of Washington; Robert Turner, in his official capacity as Director of the Washington Department of Fisheries, Defendants–Appellees.

No. 95–35471.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 5, 1996.

Decided Sept. 19, 1996.

---

\* The plaintiffs sued former Secretary of Commerce Ronald H. Brown in his official capacity.

We sua sponte substitute Mickey Kantor in his stead.

Jacob Tanzer, Ball, Janik, & Novack, Portland, Oregon, for plaintiffs-appellants.

J. Carol Williams, United States Department of Justice, Washington, DC, for federal defendants-appellees.

Stephanie L. Striffler, Assistant Attorney General, Salem, Oregon, for defendant-appellee State of Oregon.

T. Henry Wilson, III, Assistant Attorney General, Anchorage, Alaska, for defendant-appellee State of Alaska.

Robert K. Costello, Assistant Attorney General, Olympia, Washington, for defendant-appellee State of Washington.

Before REINHARDT, KOZINSKI and FERNANDEZ, Circuit Judges.

REINHARDT, Circuit Judge:

This case raises several questions of statutory interpretation involving the Endangered Species Act (ESA) and the National Environmental Policy Act (NEPA), and the way in which the two statutory schemes interact.

First, we must decide whether the issuance of an incidental take statement under § 7 of the ESA may in appropriate circumstances permit parties that are neither federal agencies nor applicants to engage in incidental takes consistent with the statement without applying for section 10 permits. We answer this question in the affirmative and conclude that Oregon and Washington were not required to obtain section 10 permits in order to issue regulations governing the harvest of in-river salmon.

Next, we must decide whether the promulgation of an incidental take statement by a federal agency constitutes major federal action for purposes of NEPA. We hold that in this case it does, because the issuance of the statement is a prerequisite to the states' adoption of the fishing regulations at issue. Thus we conclude that the National Marine Fisheries Service was required, in accordance with the provisions of NEPA, to prepare an Environmental Assessment (EA), and possibly an Environmental Impact Statement (EIS).

We also hold that the Secretary of Commerce's failure to disapprove the plans governing fishing off the coast of Alaska, thus enabling them to go into effect, constitutes major federal action. Accordingly, we again conclude that in accordance with the provisions of NEPA an EA, and possibly an EIS, were required. Finally, we determine that the plaintiffs' challenge to the actions taken by the Pacific Fishery Council is moot.

## I. Background

At the heart of this case are the Snake River sockeye salmon, the Snake River fall chinook salmon, and the Snake River spring/summer chinook salmon. In December of 1991 and May of 1992, the National Marine Fisheries Service listed the various species as threatened under the Endangered Species Act.[1]

The listed salmon are born in tributaries of the Snake River and then travel down the

1. The Snake River spring/summer chinook and fall chinook are a distinct population segment of the species Oncorhynchus tshawytscha; the sockeye is a distinct population segment of the species Oncorhynchus nerka. In August of 1994, the Service announced that it was changing the status of listed fall and spring/summer chinook salmon from threatened to endangered.

Snake to the Columbia and out to the Pacific Ocean, before returning, two to five years later, to their natal streams to spawn. During their journey, the salmon travel along thousands of miles of waterways, around eight mainstem hydroelectric dams and past thousands of acres of public and private land. Along their way, the salmon also come under a bewildering array of agencies and legal regimes. While they are in the ocean, the salmon are covered by the Magnuson Act, which authorizes the creation of fishery management councils under the Secretary of Commerce and requires the councils to develop fish management plans. Two such councils are relevant here: the North Pacific Fishery Management Council (whose members include the states of Alaska, Washington, and Oregon, as well as the National Marine Fishery Service) and the Pacific Fishery Council (whose members include California, Oregon, Washington, Idaho, and the National Marine Fishery Service). The North Pacific Fishery Management Council oversees ocean fishing for salmon in their northern range—the fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska; the Pacific Fishery Council governs ocean fishing for salmon in their southern range—seaward of California, Oregon, and Washington. The Secretary of Commerce is charged with ensuring that the fishery management councils abide by the restrictions in the Magnuson Act, designed to protect the nation's food supply and the fishing industry from the dangers of overfishing.

When the salmon enter the rivers where they spawn, they come under the jurisdiction of a different set of agencies. In the Columbia River, the management and harvest of salmon is supervised by the Columbia River Fish Management Plan, a unique, judicially created, federal-state-tribal compact that controls, through a consent decree, the rules and regulations governing fishing allocations and rights of harvest for fish that enter the Columbia River system.[2] Federal members include the National Marine Fisheries Service, the Bureau of Indian Affairs, and the United States Fish and Wildlife Service. State members include the states of Oregon and Washington.[3] A number of Indian tribes are also members.

The Columbia River Fish Management Plan does not regulate fishing directly. Rather, the plan apportions the fishing rights to the state and tribal members. The states then enact regulations governing fishing in the Columbia River, although they must do so in compliance with the terms of the Columbia River Fish Management Plan.

The state regulations must not only meet the requirements of the Columbia River Fish Management Plan, they must also comply with applicable environmental laws, especially the ESA,[4] which is administered by the United States Department of Commerce in part through the National Marine Fisheries Service.

Aside from the complexity of the interlocking legal regimes, this case is also complicated by the fact that the endangered chinook salmon intermingle with and are all but indistinguishable from hatchery chinook salmon, which are not protected by the ESA. With current mixed-stock fishing methods it is nearly impossible to catch hatchery chinook salmon in the Columbia River without also catching and killing wild chinook salmon. Section 9 of the ESA, however, makes it illegal to "take" or kill any members of an endangered species. As a result, chinook salmon river fishing, as currently practiced, would violate the ESA unless state regulations authorizing but limiting such fishing qualify for one of the ESA's two exceptions

**2.** See United States v. Oregon, 913 F.2d 576, 579 (9th Cir.1990), cert. denied, 501 U.S. 1250, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991). Moreover, the Columbia River Fish Management Plan provides management guidelines, harvest allocations, and other substantive provisions to better allow protection of endangered species in the Columbia River region. The agreement was based on the "unique biological circumstances of the Columbia River Basin fish runs and stocks, and the particular treaties, laws and judicial de-

cisions applicable to the Columbia River system."

**3.** The various groups develop harvest plans for the ocean areas and the river areas in consultation with one another to ensure that the overall percentage of fish caught does not lead to extinction of the species.

**4.** 16 U.S.C.A. §§ 1531–40 (West Supp.1995).

to § 9's prohibition on the taking of a protected species. A virtually identical problem exists with respect to sockeye salmon.

Under both the statutory exceptions to § 9, the incidental taking of an endangered species is permitted if it is determined that such action does not jeopardize the survival of the species. One exception is embodied in § 7 of the ESA, the other in § 10.[5] The § 7 exception provides a procedure whereby federal agencies and certain statutorily-defined "applicants" may obtain determinations in the form of incidental take statements through a comparatively informal consultation process. By contrast, § 10 prescribes a more rigorous and time-consuming procedure whereby private parties may apply for and obtain permits [6] authorizing incidental taking.[7]

The current controversy began on May 28, 1993 when, acting pursuant to § 7 of the ESA, the National Marine Fisheries Service issued a biological opinion and incidental take statement governing the permissible incidental take in the areas involved in this action.[8] The opinion, which is a mandatory part of the § 7 process, identified one of its objectives as follows:

> The more substantive objective of this biological opinion is to review the full range of salmon fisheries that may affect Snake River fall chinook. The review will include salmon fisheries that occur . . . in the Columbia and Snake river basins.

Endangered Species Act–Section 7 Consultation, Biological Opinion at 2. The statement, which serves as the authorizing document, analyzed a number of fisheries including those governed by the Columbia River Fish Management Plan. It allowed takings to occur in those fisheries notwithstanding the prohibitions of § 9.

After the statement was issued, the states of Washington and Oregon promulgated regulations governing fishing in the Columbia River. The first question before us is whether the issuance of the § 7 statement enabled Oregon and Washington to promulgate those regulations without first obtaining a § 10 permit. Appellees say the answer is yes. Appellants contend that it is no.

Also at issue in this lawsuit is the proper interpretation of the National Environmental Policy Act, which requires the federal government to prepare an Environmental Impact Statement for major "Federal actions" that "significantly affect[ ] the quality of the human environment," 42 U.S.C. § 4332(2)(C), unless a properly conducted Environmental Assessment shows that no such statement is necessary. 40 C.F.R. §§ 1501.4 and 1508.9(a)(1). This controversy involves three separate geographic areas: those governed respectively by the Columbia River Fish Management Plan, the North Pacific Fishery Management Council, and the Pacific Fishery Council. Appellants claim, for reasons we explain below, that an EIS was required in each of the three areas, while the appel-

**5.** Section 7 is codified in 16 U.S.C. § 1536, § 10 in 16 U.S.C. § 1539.

**6.** Section 10 of the ESA provides a procedure by which a private party may obtain a permit to engage in the incidental taking of a listed species provided the "taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." 16 U.S.C.A. § 1539(a)(2)(B)(iv). If the private party complies with the requirements of the incidental take permit, any taking of a listed species will not violate ESA Section 9. *See* 16 U.S.C. § 1539(a)(1)(B).

**7.** Under Section 10, for example, it is the applicant's duty to submit an acceptable conservation plan, however long it takes to do so. Under Section 7, by contrast, this burden is shifted to the authorizing agency and the National Marine Fisheries Service (or the U.S. Fish and Wildlife Service), and they must normally conclude formal consultations within 90 days. Section 10

requires public participation, Section 7 does not. *See generally* David Farrier, *Conserving Biodiversity on Private Land: Incentives for Management or Compensation for Lost Expectations?* 19 Harv. Envtl.L.Rev. 303, 378–79 (1995).

**8.** In 1993 and in preceding years, the National Marine Fisheries Service requested the Columbia River Fish Management Plan, through its Technical Advisory Committee, (which consists of qualified fisheries scientists from all the relevant parties to the Columbia River compact), to prepare annual biological assessments of the fishing impact on listed species in the Columbia River area. This biological assessment was submitted to the National Marine Fisheries Service by the U.S. Fish and Wildlife Service on behalf of the three federal agency signatories to the Columbia River Compact. *Id.*

lees contend that in each case there is no significant federal action and no compliance with the NEPA procedures is necessary.

## II.  Procedural History

The plaintiffs, one individual, and several aluminum companies that use voluminous quantities of electricity, filed this action in the Western District of Washington on February 17, 1994.  The Aluminum Company of America (ALCOA) and the other aluminum companies are not Good Samaritans interested in the welfare of the salmon.  They have an interest in reducing the number of fish taken by fishermen so that more fish may be taken in connection with the diversion of water used to drive hydroelectric plants.  Diverting the water for electricity production necessarily results in the killing of a number of salmon.  The number of salmon that may be killed in connection with other activities may be affected by how big a take is authorized for the fishermen.  Accordingly, the amount of water available to produce electricity depends to some extent on the number of salmon that the power companies are permitted to kill.  The final piece in the puzzle is that the power plants produce the electricity that the aluminum companies consume, and the more water that may lawfully be directed to the hydroelectric plants, the lower the price of producing the electricity and the lower the price of the electricity sold to the aluminum companies.  *See Pacific Northwest Generating Co–op. v. Brown,* 38 F.3d 1058, 1060, 1065 (9th Cir.1994).

Plaintiffs make a number of legal challenges under ESA and NEPA to the salmon harvests off the coasts of Alaska, Washington, Oregon, and California, as well as within the Columbia River.[9]  Among the parties sued by the plaintiffs are the states of Alaska, Oregon, and Washington; the Pacific Fishery Management Council and the North Pacific Fishery Management Council; and several federal agencies.  At the request of the defendants, the case was transferred to the District of Oregon.

On October 20, 1994, the District Court granted the federal defendants partial summary judgment, holding in part that NEPA did not apply to the incidental take statement and fish management plans governing the in-river and ocean harvests of salmon.  On April 4, 1995, following cross-motions for summary judgment, the district court ruled in favor of Oregon and Washington, holding that the states were not required to obtain a § 10 permit under the Endangered Species Act before promulgating regulations permitting salmon fishing in the Columbia River.  This appeal ensued.

## ANALYSIS

### III.  Is a § 10 Permit Required for Actions That are in Compliance With a § 7 Permit?

Under § 7, an agency involved in an action that could affect an endangered species must prepare a biological assessment analyzing the anticipated effects on the species.  This assessment is submitted to the National Marine Fisheries Service,[10] which issues a biological opinion examining the proposed action and the anticipated impacts on the endangered species.  16 U.S.C.A. § 1536(b)(3)(A).  If the proposed activity does not jeopardize the continued existence of the endangered species but is expected to "take" some of its members, the National Marine Fisheries Service may issue an incidental take statement allowing the proposed activity to proceed.  16 U.S.C.A. § 1536(*o*)(2).

Plaintiffs do not challenge the propriety of the § 7 incidental take statement issued by the National Marine Fisheries Service.  They contend, however, that the statement covers only actions by the National Marine Fisheries Service, the Fish and Wildlife Service, the Bureau of Indian Affairs, the Pacific Fisheries Management Council, and the North Pacific Fisheries Management Council, the five agencies listed on the front page of the biological opinion under the title

---

9.  The challenge in the Columbia River is limited to Zones 1–5, the 140–mile stretch from the mouth of the Columbia up to the Bonneville Dam.

10.  The acting agency must consult with the U.S. Fish and Wildlife Service in cases in which the affected species is within the Service's purview. 50 C.F.R. 402.01(b).

"Agency",[11] and that the states of Oregon and Washington may not issue salmon fishing regulations in reliance on the statement. Rather, they contend, the states must obtain a § 10 permit.

The biological opinion and the incidental take statement delineate the scope of activities being evaluated, and those activities clearly include more than just actions to be undertaken directly by the five agencies. The incidental take statement explicitly analyzes fishing in the Columbia River region and authorizes implementation of the Columbia River Fish Management Plan's ocean/in-river agreement within harvest limits.[12]

Appellants contend that, regardless of its language, the statement, as a matter of law, serves only to permit takings by federal agencies and applicants. Specifically, they argue that because the states of Washington and Oregon are not "applicants", the statement does not apply to actions taken by them. Therefore, appellants continue, the two states violated the ESA by issuing regulations permitting salmon fishing in the Columbia River without having obtained a § 10 permit. The federal appellees disagree and say that any taking that is in compliance with the terms and conditions of the permit is permissible without more.

If appellants were correct that actions by Oregon and Washington that are in compliance with the incidental take statement must also be authorized under a § 10 permit, then the incidental take statement would be virtually meaningless from a practical standpoint, insofar as it treats *in-river* harvests under the jurisdiction of the Columbia River Fish Management Plan. With the exception of fishing by Native American tribes, *no* fishing may take place in the relevant stretch of the Columbia River except under regulations promulgated by Oregon and Washington. Thus, if Oregon and Washington must obtain § 10 permits before issuing such regulations, the incidental take statement would have little practical effect as far as Columbia River fishing is concerned.

The statutory language that was added to § 7 in 1982 to permit the incidental taking of listed species does not limit the protection afforded by an incidental take statement to federal agencies or applicants. That language reads in pertinent part:

[A]ny taking that is in compliance with the terms and conditions specified in a written statement provided under subsection (b)(4)(iii) of this section shall not be considered to be a taking of the species concerned.

16 U.S.C. § 1536(*o*)(2). The provision indicates that any taking—whether by a federal agency, private applicant, or other party—that complies with the conditions set forth in the incidental take statement is permitted. Moreover, the implementing regulations expressly provide that a taking that is in compliance with a § 7 incidental take statement need not be authorized by a § 10 permit or any other permit in order to be exempt from

---

11. In this case, the Columbia River compact prepared a biological assessment and, through the Fish and Wildlife Service, submitted it to the National Marine Fisheries Service, which subsequently issued a biological opinion and incidental take statement. Although factually this case is unusual in that the National Marine Fisheries Service is both the federal agency that, in its role in administering the ESA, approved the incidental take statement as well as one of the recipients of the incidental take statement, no one has suggested that the agency suffered from a conflict of interest.

12. The incidental take statement provides:
The proposed implementation of the [Columbia River Fish Management Plan] and 1993 Ocean/Inriver agreement is expected to result in the incidental take of listed Snake River fall chinooksalmon. The anticipated inriver har-

vest rate for listed Snake River fall chinook, based on preseason expectations, is 28.4 percent which results in an expected catch of 459 listed fish. The [Columbia River Fish Management Plan] allows for in season adjustments in the harvest rate based on changes in the run size. For 1993, the harvest rate on Snake River fall chinook will be allowed to increase from the expected preseason rate, so long as the harvest rate on listed fall chinook does not exceed 42.2 percent. The associated catch of listed fish would be 682.
Because the catch of listed fish cannot be monitored directly during the fishery, the specified harvest rates will serve to limit the anticipated harvest of listed fish.
Endangered Species Act–Section 7 Consultation, Biological Opinion at 66.

§ 9's prohibition.[13] We give deference to a reasonable interpretation of a statute by an administrative agency charged with its implementation. *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1571 (9th Cir.1993).

We need not decide whether every taking that is in compliance with an incidental take statement is, without more, lawful under the ESA.[14] Here, the taking in question was clearly contemplated by the incidental take statement and thus explicitly falls within the bounds of the actions approved under the statement. The statement clearly anticipates implementation of the Columbia River Fish Management Plan and, in fact, bases much of its analysis on the numbers of the various types of endangered and protected salmon that will be taken under that plan. As previously noted, absent regulations promulgated by Oregon and Washington, most fishing could not occur in the relevant area of the Columbia River. Thus, implementation of the plan is dependent upon Oregon and Washington's issuance of their regulations.

We conclude that a party that is neither a federal agency nor an applicant can take members of a listed species without violating the ESA, provided the actions in question are contemplated by an incidental take statement issued under Section 7 of the ESA and are conducted in compliance with the requirements of that statement. In this case, the National Marine Fisheries Service issued an incidental take statement that clearly anticipated that Washington and Oregon would promulgate fishing regulations in accordance with its terms, as indeed they did. Because Washington's and Oregon's actions were contemplated by and in compliance with the incidental take statement issued pursuant to § 7, we conclude that the states did not violate the ESA when they issued fishing regulations without obtaining a § 10 permit.[15]

## IV. The National Environmental Policy Act

NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Federal regulations permit an agency planning a major federal action to conduct an Environmental Assessment in order to determine whether it must prepare an EIS. 40

---

13. The regulations state in pertinent part: "Any taking which is subject to a statement as specified in paragraph i(1) of this section and which is in compliance with the terms and conditions of that statement is not a prohibited taking under the Act, and no other authorization or permit under the Act is required." 50 C.F.R. 402.14(i)(5). Subsection i(1) describes § 7 incidental take statements.

14. Appellants also rely on 16 U.S.C. § 1536(b)(4)(B)(iii), the subsection cited in 16 U.S.C. § 1536(o)(2). That subsection, however, also does not contain language of limitation. It merely states that "the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement [including the incidental take statement] that—

(i) specifies the impact of such incidental taking on the species,
(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact, and
(iii) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both,

to implement the measures specified under clause (ii)."
16 U.S.C. § 1536(b)(4)(B)(iii).
Appellants argue that because subsection (b)(4)(iii) by its terms only imposes requirements on a federal agency or applicant it is limited to those two categories of actors. We disagree. That subsection simply says that federal agencies and applicants which obtain an incidental take statement must comply with its terms. It does not say that another party is not also covered by the incidental take statement if it, too, complies with its terms. We believe they are.

15. We note that although there are few, if any, cases considering the permissible scope of § 7 and § 10 incidental take authorizations, our relatively expansive interpretation of § 7 is consistent with the evidence of how the two provisions have been implemented. Between 1988 and 1993, over 70,000 consultations were conducted as part of the § 7 process, while only twenty § 10(a)(1) incidental take permits had been requested through 1991 and only thirty-six had been issued as of September 1994. J.B. Ruhl, *Section 7(a)(1) of the "New" Endangered Species Act: Rediscovering and Redefining the Untapped Power of Federal Agencies' Duty to Conserve Species,* 25 Envtl.L. 1107, 1119 n. 57, 1121 (1995).

C.F.R. §§ 1501.4 and 1508.9(a)(1). If the EA shows that the proposed action will have no significant impact, "the agency may issue a finding of no significant impact ("FONSI") and then execute the action." *Sierra Club v. Babbitt,* 65 F.3d 1502, 1505 (9th Cir.1995); *California Trout v. Schaefer,* 58 F.3d 469, 472 (9th Cir.1995). If however, the EA shows that the proposed activity will have a significant impact, the federal agency must prepare an EIS *before* proceeding with the proposed activity. 42 U.S.C. § 4332(2)(C); *Conner v. Burford,* 848 F.2d 1441, 1446 (9th Cir.1988) ("Section 102(2)(C) of NEPA requires Federal agencies to file an EIS before undertaking 'major Federal actions significantly affecting the quality of the human environment.' "), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989); *see also Thomas v. Peterson,* 753 F.2d 754, 760 (9th Cir.1985) ("A central purpose of an EIS is to force the consideration of environmental impacts in the decisionmaking process.").

Although the ESA permits a biological assessment (BA) to " 'be undertaken as part of a Federal agency's compliance with the requirements of ... the National Environmental Policy Act of 1969 (42 U.S.C. 4332),' " 16 U.S.C. § 1536(c)(1), we have previously held that "this subsection does not indicate that a BA may substitute entirely for an EA." *Save The Yaak Comm. v. J.R. Block,* 840 F.2d 714, 718 (9th Cir.1988). We explained: "While a BA analyzes the impact of a proposed action upon endangered species, an EA analyzes the impact of the proposed action on all facets of the environment. Thus, if only a BA is prepared, there may be gaps in the agency's environmental analysis." *Id.*

### A. The Columbia River Fish Management Plan

The district court held for two different reasons that the in-river harvests under the Columbia River Fish Management Plan did not trigger the requirements for an EA or EIS under the provisions of the National Environmental Policy Act. We need discuss only one at any length.[16] The court held that the issuance of the incidental take statement did not constitute major federal action for purposes of NEPA because there was not sufficient federal involvement. We disagree.

■ Federal regulations implementing NEPA provide the following definition of the level of federal involvement necessary to require an EIS:

> Major Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility.... [Actions include] [a]pproval of specific projects, such as construction of management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

40 C.F.R. § 1508.18. We have previously determined that the mere fact of federal participation in a state-run project is not sufficient federal action to require an EIS. In *Almond Hill School v. U.S. Dept. of Agriculture,* 768 F.2d 1030 (9th Cir.1985), for example, we held that federal participation in a state-run beetle eradication project did not in itself constitute major federal action and accordingly did not trigger the requirement for an EIS. *Id.* at 1039. Thus, the mere fact that the Departments of Commerce and the Interior belong to the Columbia River Fish Management Plan is not sufficient federal involvement to constitute major federal action.

■ In *Almond Hill,* we said that the key to determining whether there was major federal action was the extent of the federal involvement. We acknowledged that there is not always a clear line between the cases in

---

16. The court's second reason was that because the Columbia River Fish Management Plan was created through a consent degree it was exempt from NEPA as a result of 40 C.F.R. § 1508.12 (1995), which exempts "the Judiciary." The C.F.R. section reads in pertinent part: "Federal agency means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President...." In the district court and on appeal, the federal appellees strongly disagreed with the district judge's position. They are correct. Even if the creation of the Columbia River Fish Management Plan were to be classified as an act of the Judiciary because the plan was created through a consent decree, actions subsequently taken through or under the plan cannot be considered actions by the Judiciary.

which that involvement constitutes major federal action and those in which it does not. 768 F.2d at 1039. It is clear, however, both from our cases and from the federal regulations, *see* 40 C.F.R. § 1508.18, that if a federal permit is a prerequisite for a project with adverse impact on the environment, issuance of that permit does constitute major federal action and the federal agency involved must conduct an EA and possibly an EIS before granting it. *See Jones v. Gordon,* 792 F.2d 821, 827–29 (9th Cir.1986); *Port of Astoria v. Hodel,* 595 F.2d 467, 478–79 (9th Cir.1979). The federal appellees acknowledge as much, stating in their brief: "We agree that the issuance of a federal permit, without which a particular activity is prohibited, is a federal action. However, we disagree that the issuance of a [biological opinion] and incidental take statement is a federal permit or that it enables the state-controlled in-river fishery to take place."

Federal appellees argue that they did not authorize the harvesting of endangered salmon and thus claim that the district court was correct in finding that there was no major federal action in this case. They contend that the states of Washington and Oregon, which actually issued the regulations governing salmon fishing in the Columbia River, did not draw their authority to do so from the incidental take statement—even though their regulations would be illegal, if not for that statement. As the federal appellees put it:

> the incidental take statement does not "authorize" the action. The agency or a non-federal party could choose to act without complying with the incidental take statement. Of course, to do so is to act at the risk that one might incidentally take a member of the species and then be potentially subject to the penalties and enforcement measures in Section 11 of the [Endangered Species] Act.

Brief of the federal appellees at 18.

The federal appellees try to distinguish *Jones,* a case in which the federal government issued researchers a permit to capture, or take, killer whales for scientific investigations, by claiming that in that case the "action could not lawfully go forward without the permit." *Id.* "Here, by contrast," the

federal appellees assert, "the activity—fall in-river fishing that is targeted at species that are *not* listed could lawfully go forward absent the incidental take statement." They then acknowledge, however, in a concession that totally undermines their argument: "Of course, if the activity 'incidentally' took a member of the listed species, that would violate the ESA, absent an incidental take statement or section 10 permit." *Id.* at 18–19.

■ We conclude that the federal appellees' position is untenable. Using current methods, it is all but impossible to fish for salmon that are not listed without incidentally taking salmon that are listed. Indeed, in previous years, the start of the fishing season has been delayed until the incidental take statement was issued. We conclude that the incidental take statement in this case is functionally equivalent to a permit because the activity in question would, for all practical purposes, be prohibited but for the incidental take statement. Accordingly, we hold that the issuance of that statement constitutes major federal action for purposes of NEPA.

For the above reasons, we conclude that the National Marine Fisheries Service, the federal agency that issued the incidental take statement, was required by law to comply with the requirements of NEPA *before* issuing the statement.

### B. The North Pacific Fish Management Council

The appellants also contend that the district court erred in holding that an EIS was not required before the ocean salmon fishing that took place in the territory under the jurisdiction of the North Pacific Fish Management Council could proceed. Once again we are compelled to agree.

The fishing in question comes under the jurisdiction of the North Pacific Fish Management Council. The Secretary of Commerce (through the National Marine Fishery Service) is responsible, in turn, for ensuring that the harvest plans issued by the council (or its delegate) comply with federal requirements, especially the Magnuson Act. Under the Magnuson Act, "[a]fter the Secretary

receives a fishery management plan ... which was prepared by a Council ..., the Secretary shall immediately commence a review of the management plan ... to determine whether it is consistent with national standards ... and any other applicable law." 16 U.S.C. § 1854(a)(1)(B). If the Secretary does not disapprove a proposed plan, it automatically takes effect. 16 U.S.C. § 1854(b)(1)(A) & (B).

Since 1990, the Council has delegated authority over those ocean harvests to the State of Alaska. That delegation does not alter the Secretary's statutory duties. The Secretary must still review the harvest plans prepared by the State of Alaska in accordance with his obligations under the Magnuson Act. The Secretary has done so, and because he has not seen fit to disapprove those plans, they have become law.

It is clear from federal regulations that federal inaction can count as federal action for purposes of triggering the EIS requirement under NEPA: "Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action." 40 C.F.R. § 1508.18. The regulations also state: "Major federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility." *Id.*

The Secretary's mandatory obligation to review the plans prepared by the council or its delegate, here the State of Alaska, suffices to make his failure to disapprove major federal action under 40 C.F.R. § 1508.18. Actions by the North Pacific Fish Management Council are clearly subject to the Secretary's control and responsibility. It is equally clear that those actions may have major effect. Thus we conclude that the Secretary's failure to disapprove the plans rises to the level of major federal action for purposes of NEPA.

### C. The Pacific Fishery Council

The district court concluded that plaintiffs' claim about the Pacific Council's management of the ocean harvest in its territory was moot "given significant changes in 1994 harvest actions." Opinion of the District Court at 26.

A controversy is "moot" when the "issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Friends of the Payette v. Horseshoe Bend Hydroelectric*, 988 F.2d 989, 996 (9th Cir.1993). Defendants bear a "heavy" burden of demonstrating that plaintiffs' claims are moot. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1329 (9th Cir.1992). "Although the mootness doctrine ordinarily bars a challenge to an action that has already taken place, a challenge is not barred if the action at issue is capable of repetition, yet likely to evade review." *Idaho Dept. of Fish & Game v. Nat. Marine Fisheries Serv.*, 56 F.3d 1071, 1074–75 (9th Cir.1995). We have held that agency actions fall within the "capable of repetition" exception if "(1) the duration of the challenged action is too short to allow full litigation before it ceases, and (2) there is a reasonable expectation that the plaintiffs will be subjected to it again." *Greenpeace Action*, 14 F.3d at 1329.

In district court, the plaintiffs raised two challenges to the 1993 ocean harvest in the Pacific Council's territory. They claimed that the defendants: (1) failed to adequately evaluate the environmental impact of the harvest; and (2) relied upon a base period that was invalidated in *Idaho Dept. of Fish & Game.* In oral arguments before the district court, the plaintiffs conceded that their first claim was moot, thereby effectively waiving that claim. The district court found the second claim moot as well.

Plaintiffs argue, citing *Greenpeace Action,* that because the 1993 harvest decision was in effect for less than one year and because the issues concerning the proper base level are likely to recur in the future, the judge erred in holding that the second claim was moot. They rely on *Greenpeace Action,* in which we held that even though the 1991 fishing season total allowable catch (TAC) of pollack had expired, the petitioners' challenge of the TAC level of pollack was not moot. We concluded that the issue was likely to recur again because the Secretary of Commerce was relying on the same biological opinion

that determined the 1991 TAC in calculating the TAC for 1992. *Id.* at 1330.

■ Although the federal appellees in the instant case are relying on the same biological opinion in determining the proper base period for the future harvesting, the defendants are using a different method of calculating the baseline, a method mandated by the district court in *Idaho Dept. of Fish & Game v. National Marine Fisheries Serv.*, 850 F.Supp. 886 (D.Or.1994). Accordingly, we believe that this case is more analogous to *Idaho Dept. of Fish & Game v. National Marine Fisheries Serv.*, 56 F.3d 1071 (9th Cir.1995), than *Greenpeace Action.* In *Idaho,* we found the Idaho Department of Fish and Game's claim against the National Marine Fisheries Service moot because the Service would no longer be relying on the particular biological opinion that was being challenged, but rather upon a new opinion. We conclude that the same rule is applicable where an agency will be basing its rulings on different criteria or factors in the future. Accordingly, we hold that plaintiffs' challenge to the Pacific Council Management Plan is moot.

### Conclusion

The regulations that Washington and Oregon issued governing salmon fishing in the Columbia River did not violate the ESA because those regulations were contemplated by and in compliance with the § 7 incidental take statement issued by the National Marine Fisheries Service. Thus, no § 10 permit was required. Issuance of the statement, however, constituted major federal action for purposes of NEPA and thus triggered the requirements for an EA and possibly an EIS. Under NEPA, the federal appellees were also required to prepare an EA, and possibly an EIS, for the area covered by the North Pacific Fish Management Council. The challenge to the harvest plan issued by the Pacific Fishery Council is, however, moot.

AFFIRMED IN PART, REVERSED IN PART, DISMISSED IN PART, AND REMANDED.