[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

_____

No. 97-2083

_____

D.C. Docket No. 95-587-CIV-ORL-22

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
08/03/98
THOMAS  K. KAHN
CLERK

LOGGERHEAD TURTLE (Caretta caretta);
GREEN TURTLE (Chelonia mydas), et al.,

                                Plaintiffs-Appellants,

    versus

THE COUNTY COUNCIL OF VOLUSIA
COUNTY, FLORIDA, a political subdivision
of the State of Florida,

                                Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(August 3, 1998)**

Before HATCHETT, Chief Judge, RONEY and CLARK, Senior Circuit Judges.

HATCHETT, Chief Judge:

The loggerhead sea turtle (Caretta caretta) and green sea turtle (Chelonia mydas) with appellants Shirley Reynolds and Rita Alexander (collectively the Turtles) challenge the district court's dismissal of their case brought pursuant to the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544 (1994). They present: (1) an issue of first impression, whether the incidental take permit exception to the ESA's "take" prohibition applies to an activity performed as a purely mitigatory measure upon which the issuing agency conditions the permit; (2) an issue of standing, whether a governmental entity's regulatory control of minimum wildlife protection standards can cause redressable injury to protected wildlife in locations where non-party governmental entities possess supplemental authority to regulate and/or exclusively control enforcement; and (3) an issue of pleading amendment, whether another federally protected sea turtle should have been allowed to join the Turtles as a party. We reverse on all issues and remand for further proceedings.

## I. BACKGROUND

In 1978, the United States Fish and Wildlife Service (Service) listed the loggerhead sea turtle as a threatened species and the green sea turtle as an endangered species. See 50 C.F.R. § 17.11(h) (1997).[1] Adjoining the Atlantic Ocean for nearly forty miles in northeast Florida, Volusia County's beaches play host to both humans and sea turtles. From north-to-south, its beach communities include Ormond-by-the-Sea, Ormond Beach, Daytona Beach, Daytona Beach Shores, Wilbur-by-the-Sea, Town of Ponce Inlet, City of New Smyrna Beach and Bethune Beach.[2] Female adult sea turtles come ashore in the spring, deposit eggs in the sand and return

---

[1] The green sea turtle is endangered in Florida and along the Pacific coast of Mexico. In all other locations, it is "threatened." 50 C.F.R. § 17.11(h).

[2] Daytona Beach and Daytona Beach Shores are the most urbanized beach communities.

to the ocean. Months later, when sea turtle hatchlings break out of their shells at night, they instinctively crawl toward the brightest light on the horizon. On an undeveloped beach, the brightest light is the moon's reflection off the surf. On a developed beach, the brightest light can be an inland artificial source.

On June 8, 1995, the Turtles instituted this lawsuit in the United States District Court for the Middle District of Florida under the citizen-suit provision of the ESA, 16 U.S.C. § 1540(g)(1)(A). Seeking declaratory, permanent injunctive and -- in a separate, contemporaneously-filed motion -- preliminary injunctive relief, the Turtles alleged that appellee County Council of Volusia County, Florida's (Volusia County) "refusal to ban beach driving during sea turtle nesting season and ban beachfront artificial light sources that adversely impact sea turtles" violates the ESA's "take" prohibition, 16 U.S.C. § 1538(a)(1)(B). The Turtles quoted excerpts from their federally-issued recovery plans that "[a]rtificial beachfront lighting from buildings, streetlights, dune crossovers, vehicles and other types of beachfront lighting have been documented in the disorientation (loss of bearings) and misorientation (incorrect orientation) of hatchling turtles" and that "nesting females avoided areas where beachfront lights were the most intense" or "abort[] nesting attempts at a greater frequency in lighted areas." (Quoting United States Fish & Wildlife Serv., Dep't of the Interior; Nat'l Marine Fisheries Serv., Dep't of Commerce, Recovery Plan for U.S. Population of Loggerhead Turtle (Caretta caretta) (1991), at 6-7; United States Fish & Wildlife Serv., Dep't of the Interior; Nat'l Marine Fisheries Serv., Dep't of Commerce, Recovery Plan for U.S. Population of Atlantic Green Turtle

We have omitted any discussion of the beach community of Silver Sands because the parties do not specifically mention it in their briefs or the record. It may be that Silver Sands is another unincorporated area like Wilbur-by-the-Sea, Ormond-by-the-Sea and Bethune Beach, since that list does not appear to be an exhaustive one. The parties can resolve this minor detail on remand.

3

(<u>Chelonia</u> <u>mydas</u>) (1991), at 4-5.) As exhibits, the Turtles advanced reports of fatal "disorientations" and "misorientations," as well as "false crawls" (aborted nesting attempts) that volunteer "Turtle Patrol" members had witnessed throughout Volusia County.

Volusia County's initial response to the complaint was twofold. First, on July 12, 1995, it answered the complaint. Second, on July 16, 1995, it applied to the Service for an "interim" incidental take permit. <u>See</u> 16 U.S.C. § 1539(a). After a hearing, the district court granted in part the Turtles' motion for a preliminary injunction as to beach driving, but denied preliminary relief as to artificial beachfront lighting. <u>See</u> <u>Loggerhead Turtle v. County Council of Volusia County, Fla.</u>, 896 F. Supp. 1170, 1178-83 (M.D. Fla. Aug. 1, 1995).[3]

In September 1995, the district court entered a pretrial order that: (1) set a deadline of November 1, 1995, for the parties to file motions to amend and add parties; (2) closed discovery on February 1, 1996; and (3) scheduled trial for April 1996. On October 27, 1995, the Turtles filed a motion for leave to amend their original complaint to add the leatherback sea turtle (<u>Dermochelys</u> <u>coriacea</u>) as a party, attaching the proposed amended complaint and two exhibits to the motion. During the pendency of the Turtles' motion for leave to amend, Volusia County successfully moved to continue the trial until October 1996, citing the imminence of the Service's permit decision.

---

[3] Finding a reasonable likelihood that beach driving takes loggerhead and green sea turtles, the court preliminarily enjoined Volusia County from permitting vehicles on the beach from one hour before sunset until one hour after sunrise. The court excepted from the injunction "County vehicles which are equipped with yellow or 'turtle-friendly' headlights." 896 F. Supp. at 1182. Without exception, the court enjoined Volusia County "from permitting any vehicle to enter the 'conservation zone.'" 896 F. Supp. at 1182.

The Turtles subsequently moved the district court to reconsider its denial of preliminary injunctive relief as to artificial beachfront lighting, but the court denied the motion.

Prior to the close of discovery, Volusia County moved for partial summary judgment. The county argued that the Turtles lacked standing to assert claims for takes in non-party municipalities that regulate and enforce their own lighting restrictions. On July 9, 1996, the district court granted the motion, concluding that: (1) the Turtles failed to show any causal connection between Volusia County's regulatory acts and the alleged takes; and (2) the court lacked the power to redress the alleged injury without joinder of those municipalities as defendants.

In the same order, the district court denied the Turtles' motion for leave to amend, reasoning that: (1) the court lacked subject matter jurisdiction over the leatherback sea turtle since it was unable to locate a copy of the Turtles' notice of intent to sue letter that their motion referenced; (2) the Turtles unduly delayed in filing the motion; and (3) Volusia County would be prejudiced if the court extended the preliminary injunction to include the leatherback sea turtle whose nesting season starts earlier every spring.

After Volusia County obtained another trial continuance, the Service issued the county an incidental take permit on November 21, 1996. The next day, Volusia County moved the district court to dissolve the preliminary injunction and dismiss the Turtles' case, contending that the permit mooted further proceedings. Although conceding that the permit authorized incidental takes through beach driving, the Turtles contended that it did not authorize incidental takes through artificial beachfront lighting. The district court agreed with Volusia County and closed the case. This appeal follows.

## II. ISSUES

We address three issues: (1) whether the district court erred in concluding that Volusia County's incidental take permit excepted it from liability for taking protected sea turtles through

5

artificial beachfront lighting; (2) whether the district court erred in concluding that the Turtles lack standing to sue Volusia County for takes that occur in the non-party municipalities of Daytona Beach, Daytona Beach Shores, Ormond Beach and New Smyrna Beach that have supplemental authority to regulate and/or independently enforce their own artificial beachfront lighting restrictions; and (3) whether the district court abused its discretion in denying the Turtles' motion for leave to amend their original complaint to include the leatherback sea turtle as a party. Our standard of review for the first two issues is de novo. See Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Enginneers, 87 F.3d 1242, 1246 (11th Cir. 1996) ("We review questions of law de novo[.]"); Engineering Contractors Ass'n of South Fla. v. Metropolitan Dade County, 122 F.3d 895, 903 (11th Cir. 1997) ("[T]his Court reviews standing de novo."), cert. denied, 118 S. Ct. 1186 (1998); Forbus v. Sears Roebuck & Co., 30 F.3d 1402, 1404 (11th Cir. 1994) ("A district court's decision to grant or deny leave to amend is reviewed for abuse of discretion."), cert. denied, 513 U.S. 1113 (1995).

## III. CONTENTIONS

As to the first issue, the Turtles contend that Volusia County's incidental take permit authorizes only incidental takes of sea turtles from beach driving, not from artificial beachfront lighting. The Turtles argue that to fall within the incidental take permit exception to the "take" prohibition, the Service's permission must be express and activity-specific. The Turtles also assert that the district court could not infer such permission from the Service's conditioning the permit on lighting-related mitigatory measures.

Volusia County responds that under the permit, it must survey every light source, study their impacts and implement methods to correct light sources that misorient sea turtles. Volusia County argues that given those extensive mitigatory requirements, the Service clearly contemplated that it be excepted from liability for any incidental takes that artificial beachfront lighting causes during the life of the permit.

With regard to the second issue, the Turtles contend that the court can fairly trace sea turtles' lighting-related "harm" in the non-party municipalities of Daytona Beach, Daytona Beach Shores, Ormond Beach and New Smyrna Beach to Volusia County's regulatory acts. The Turtles claim that Volusia County exercises sufficient regulatory authority in imposing county-wide minimum artificial beachfront lighting restrictions and exempting Daytona Beach and Daytona Beach Shores from any such restrictions. Furthermore, the Turtles assert that the district court possesses the power to redress any and all lighting-related takes. To hold otherwise, the Turtles posit, would violate the accepted notion that both a person whose actions adversely affect a protected species and a governmental body that authorizes that person's actions can violate the ESA's "take" prohibition.

7

Focusing only on the municipalities of Daytona Beach and Daytona Beach Shores, Volusia County contends that takes in those locations are traceable only to those municipalities' independent regulatory and enforcement acts or omissions. According to Volusia County, the Turtles should have sued those municipalities if they believed that artificial beachfront lighting-related takes occurred on their beaches. Additionally, Volusia County argues that its lack of authority to regulate and enforce lighting restrictions in those municipalities left the district court without power to redress the alleged "harm." Moreover, Volusia County contends that the Turtles' requested relief, if granted, would effectively force it to pass a new ordinance or amend its existing one, violating the separation of powers.

Regarding the third issue, the Turtles assert that the district court should have "freely given" them leave to amend their complaint to add the leatherback sea turtle as a party. They contend that, contrary to the district court's findings: (1) they sufficiently notified both the Service and Volusia County of their intent to sue for takes of the leatherback sea turtle through artificial beachfront lighting; (2) they discovered new information after they filed the original complaint; and (3) Volusia County would not have been unduly prejudiced because the Turtles did not ask to amend the preliminary injunction and the parties included the leatherback sea turtle in discovery.

Volusia County responds that the Turtles' notice of intent to sue inadequately referred to the leatherback sea turtles as "nesting" on Volusia County beaches, as opposed to being "taken." Volusia County contends that the Turtles possessed evidence of takes at least three months prior to filing their motion for leave to amend. Finally, Volusia County points to the "additional expense and possible delay" that the Turtles' amendment would cause.

## IV. DISCUSSION

Under the ESA, it is unlawful to "take" endangered or threatened wildlife unless a statutory exception applies. 16 U.S.C. § 1538(a)(1)(B) (1994) (the "take" prohibition); see 50 C.F.R. § 17.31(a) (1997) (the "take" prohibition applies to threatened as well as endangered wildlife). Defined broadly, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect[.]" 16 U.S.C. § 1532(19); see Babbitt v. Sweet Home Chapter of Communities for a Great Or., 115 S. Ct. 2407, 2416 (1995) ("Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions."). It is equally unlawful "to attempt to commit, solicit another to commit, or cause to be committed" a "take." 16 U.S.C. § 1538(g).

"Harass" and "harm," within the meaning of "take," are defined through regulation. The Secretary of the Interior, through the Service, has construed "harass" as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." 50 C.F.R. § 17.3; see 16 U.S.C. § 1533(d) (delegating regulatory authority to the "Secretary"); Sweet Home, 115 S. Ct. at 2410 & n.2 (noting that the Secretary of the Interior, through the Director of the Service, promulgated 50 C.F.R. § 17.3).

The crux of the Turtles' artificial beachfront lighting allegations centered on "harm," "an act which actually kills or injures wildlife" that may include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3 (the "harm" regulation).[4] At the preliminary injunction stage, the district court found "overwhelming[]"

_____

[4] The Supreme Court recently upheld the regulatory definition of "harm" as a legitimate interpretation of the ESA's "take" prohibition. See Babbitt v. Sweet Home Chapter of Communities for a Great Or., 115 S. Ct. 2407, 2418 (1995) ("[B]ased on the text, structure, and legislative history of the ESA, . . . the Secretary reasonably construed the intent of Congress when he defined 'harm' to include 'significant habitat modification or degradation that actually

9

evidence that artificial beachfront lighting "harms" sea turtles on Volusia County's beaches. 896 F. Supp. at 1180-81.[5] Similarly, at the summary judgment stage, the district court found a genuine factual dispute "as to whether the artificial beachfront lighting controlled by Volusia County is responsible for 'taking' sea turtles."[6]

## A.

The incidental take permit exception to the "take" prohibition and its regulatory constructions, including the "harm" regulation, can be found in 16 U.S.C. § 1539(a). As relevant to this case, the Service "may permit, under such terms and conditions as [it] shall prescribe . . . any taking otherwise prohibited by section 1538(a)(1)(B) of [the ESA] if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).[7] As a prerequisite to receiving an incidental take permit, the applicant must

___

kills or injures wildlife.'").

[5] The district court also concluded that the same evidence showed that artificial beachfront lighting "harasses" sea turtles.

[6] None of the parties contests these findings.

[7] The ESA assigns the "Secretary" the responsibility for issuing incidental take permits. See 16 U.S.C. § 1532(15) (defining "Secretary" to include the Secretary of the Interior, the Secretary of Commerce, and the Secretary of Agriculture), § 1539(a)(1). Because this case involves sea turtles on land, the Fish and Wildlife Service served as the issuing agency on behalf of the Secretary of the Interior. See 50 C.F.R. § 222.23(a) ("[T]he U.S. Fish and Wildlife Service has jurisdiction for sea turtles while the turtles are on land."); 50 C.F.R. § 17.22 ("[T]he Director [of the Fish and Wildlife Service] may issue a permit authorizing any activity otherwise prohibited by [50 C.F.R. § 17.21, the regulatory version of the 'take' prohibition], . . . for the incidental taking of endangered wildlife."); 50 C.F.R. § 17.32 (same with regard to threatened wildlife); Hawksbill Sea Turtle v. Federal Emergency Mgt. Agency, 126 F.3d 461, 470 (3d Cir. 1997) ("[W]hen the turtles are swimming in [Vessup Bay, Virgin Islands], Commerce bears regulatory responsibility, and when the turtles return to the beach, the regulatory baton passes to Interior."). The Secretary of Commerce, through the National Marine Fisheries Service, issues incidental take permits concerning certain marine-based fish and wildlife. See 50 C.F.R. § 217.2 ("Endangered species of fish or wildlife other than those covered by [50 C.F.R. §§ 216-227] are under the jurisdiction of the Secretary of the Interior."); 50 C.F.R. § 222.23(a) (listing species of

submit a habitat conservation plan that specifies: "(i) the impact which will likely result from such taking; (ii) what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps; (iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and (iv) such other measures that the [issuing agency] may require as being necessary or appropriate for purposes of the plan." 16 U.S.C. § 1539(a)(2)(A).[8] Service regulations further instruct the applicant to include a "complete description of the activity sought to be authorized" and "[t]he common and scientific names of the species sought to be covered by the permit, as well as the number, age, and sex of such species, if known[.]" 50 C.F.R. § 17.22(b)(1)(i)-(ii) (endangered wildlife); 50 C.F.R. § 17.32(b)(1)(iii)(A)-(B) (threatened wildlife).

Upon receiving a complete application package, the Service must publish notice in the Federal Register and provide the public an opportunity to comment on whether the Service should issue the permit. 16 U.S.C. § 1539(a)(2)(B); 50 C.F.R.§ 17.22 ("The Director [of the Service] shall publish notice in the Federal Register of each application for [an incidental take permit]. Each notice shall invite the submission from interested parties, within 30 days after the date of the notice, of written data, views, or arguments with respect to the application."); 50 C.F.R. § 17.32(b)(1)(ii); see, e.g., Notice of Receipt of an Application for an Incidental Take

---

fish and wildlife "currently under the jurisdiction of the Secretary of Commerce[,]" including "sea turtles while the turtles are in the water"); Ramsey v. Kantor, 96 F.3d 434, 438-40 (9th Cir. 1996) (discussing the National Marine Fisheries Service's issuance of an incidental take statement for commercial in-river salmon fishing).

[8] Although the ESA refers to this document as merely a "conservation plan," it is commonly referred to a "habitat conservation plan." Compare 16 U.S.C. § 1539(a)(2)(A) with, e.g., Notice of Availability of Final Handbook for Habitat Conservation Planning and Incidental Take Permitting Process, 61 Fed. Reg. 63854 (1996).

Permit, 61 Fed. Reg. 9716 (1996) (summarizing Volusia County's application). Upon expiration

of the public comment period, the Service must issue the permit if it finds that:

> (i) the taking will be incidental;
> (ii) the applicant will, to the maximum extent practicable,
> minimize and mitigate the impacts of such taking;
> (iii) the applicant will ensure that adequate funding for the plan
> will be provided;
> (iv) the taking will not appreciably reduce the likelihood of the
> survival and recovery of the species in the wild; . . .
> (v) the measures, if any, required under [16 U.S.C. §
> 1539(a)(2)(A)(iv)] will be met; [and]
> [the Service] has received such other assurances as [it] may require
> that the [habitat conservation plan] will be implemented[.]

16 U.S.C. § 1539(a)(2)(B); 50 C.F.R. § 17.22(b)(2); 50 C.F.R. § 17.32(b)(2).[9]

An incidental take permit "may authorize a single transaction, a series of transactions, or

a number of activities over a specific period of time." 50 C.F.R. § 17.22; 50 C.F.R. § 17.32.

Additionally,

> [t]he authorizations on the face of a permit which set forth specific
> times, dates, places, methods of taking, numbers and kinds of
> wildlife or plants, location of activity, authorize certain
> circumscribed transactions, or otherwise permit a specifically
> limited matter, are to be strictly construed and shall not be
> interpreted to permit similar or related matters outside the scope of
> strict construction.

50 C.F.R. § 13.42; see also 50 C.F.R. § 220.42. Finally, the applicant's failure to comply "with

the terms and conditions of the permit" requires the Service to revoke the permit. 16 U.S.C. §

1539(a)(2)(C).

We turn first to the Turtles' contention that Volusia County's incidental take permit does

not expressly authorize takings through artificial beachfront lighting. Such express authority, if

---

[9] The applicant must also be free of disqualifying factors, such as prior criminal or civil violations of federal wildlife statutes. See 50 C.F.R. § 13.21 (b)-(c) (incorporated by reference into 50 C.F.R. §§ 17.22(b)(2), 17.32(b)(2)).

it exists, can be found only within the four corners of the permit.  See generally 16 U.S.C. §

1539(a) (issuing official must "prescribe" the permit's "terms and conditions").  In its

introductory headline, Volusia County's incidental take permit states that the Service "authorizes

incidental take within the Defined Area or County Beaches, associated with the activities

described in Condition F below, of [appellant loggerhead sea turtle, appellant green sea turtle,

leatherback sea turtle, hawksbill sea turtle (Eretmochelys imbricata) and Kemp's ridley sea turtle

(Lepidochelys kempii)] conditioned upon implementation of the terms and conditions of this

Permit."  Condition F, in turn, lists eleven "authorized" types of incidental take:

> F.      The following types of incidental take are authorized
> herein, subject to the continued validity of this Permit:
>
> 1.      Harassment, injury, and/or death to sea turtle eggs
> and/or hatchlings resulting from public and
> emergency and/or safety vehicles driving over
> unmarked/unprotected sea turtle nests located in
> designated traffic lane/driving area(s) or ramp
> [illegible] area(s) on County Beaches.
>
> 2.      Harassment, injury, and/or death to sea turtle eggs
> and/or hatchlings resulting from emergency and/or
> safety vehicles driving over unmarked/unprotected
> sea turtles nests located within the Defined Area.
>
> 3.      Harassment, injury, and/or death to sea turtle eggs
> and/or hatchlings resulting from emergency and/or
> safety vehicles driving over marked sea turtle nests
> located within the Defined Areas.
>
> 4.      Harassment, injury, and/or death to hatchling sea
> turtles emerging from unmarked/unprotected nests
> and subsequently caught in vehicle ruts in areas
> where no rut removal has taken place.
>
> 5.      Harassment, injury, and/or death to adult, hatchling,
> stranded, or post-hatchling washback [sic] sea
> turtles resulting from collisions with emergency
> and/or safety vehicles operating within the Defined

13

Area; such vehicles may also disorient/harass adults and/or hatchling sea turtles with headlights while in motion or at rest for less than one minute, or harass adult sea turtles during nesting activity.

6. Harassment, injury, and/or death to adult female sea turtles attempting to nest in the Transitional and/or Urban Areas of the County Beaches between 8 a.m. and 7 p.m., resulting from collisions with <u>vehicles</u> operated by the general public.

7. Harassment, injury, and/or death to hatchling sea turtles emerging from the nest and/or crawling from the Transitional and/or Urban Areas of the County Beaches to the ocean between 8 a.m. and 7 p.m., resulting from collisions with <u>vehicles</u> operated by the general public pursuant to terms and conditions of this permit.

8. Harassment, injury, and/or death to post-hatchling sea turtles that have emerged from a nest and entered the ocean by having been washed back onto Transitional and/or Urban Areas of the County Beaches resulting from collisions with <u>vehicles</u> operated by the general public pursuant to terms and conditions of this permit.

9. Harassment, injury, and/or death to nesting female turtles attempting to nest in the Defined Areas, resulting from physiological stress of potentially increasing the number of false crawls during the nesting season, or from sand compaction due to <u>vehicles</u> operating within the Defined Area pursuant to the terms and conditions of this permit.

10. Harassment, injury, and/or death of sea turtle and/or hatchlings in unmarked/unprotected nests due to physical crushing by activities associated with (1) marking the established Conservation Zone in the Transitional and Urban Areas of the County Beaches; (2) placement of trash receptacles on County Beaches; (3) placement of portable toilets as outlined in the [habitat conservation plan]; and (4) beach maintenance activities, including ramp maintenance.

14

11. Harassment, injury, and/or death of sea turtle eggs and/or nests laid outside the normal sea turtle nesting season, May 1 through October 31, when a nest monitoring/marking program is not in place.

(Emphasis added.) Indisputably, these eleven types of incidental take relate only to vehicular access on Volusia County's beaches. None of the eleven authorized activities listed in Condition F concerns artificial beachfront lighting. The only form of lighting mentioned in Condition F is vehicular headlights.

Although the majority of its conditions concern beach driving, the incidental take permit does address artificial beachfront lighting. Condition G of the permit, entitled "Mitigation/Minimization Measures," lists fifteen categories of "measures [to] be employed by the Permittee to ensure that take is minimized and mitigated." These categories fall under the following general headings: (1) "Protected Species Beach Management Areas"; (2) "Tire Tracks/Rut Removal Program"; (3) "Driving Zone Delineation"; (4) "Operation of Non-Public Vehicles within Conservation Zones and Protected Species Beach Management Areas"; (5) "Placement and Maintenance of Portable Facilities"; (6) "Maintenance and Placement of the Conservation Zone Markers"; (7) "Nighttime Operation of Law Enforcement/Safety Vehicles"; (8) "Special Beach Events"; (9) "Lifeguard Station Management"; (10) "Commercial Fishermen"; (11) "Beach/Access Ramp Maintenance and Cleaning"; (12) "Standards for Beach Evacuation"; (13) "Artificial Beachfront Lighting"; (14) "Off-Beach Parking Plan"; and (15) "Species Management Program." (Emphasis added.) Most of these categories contain lengthy subcategories as well.

15

The mitigation measures relative to artificial beachfront lighting occupy less than two out of twenty-five pages of Volusia County's incidental take permit:

13. **Artificial Beachfront Lighting.**

    i. **Beachfront Lighting Management Plan.** By November [illegible date] 1997, the Permittee shall have developed a Beach Lighting Management Plan. The U.S. Fish and Wildlife Service must approve the Beach Lighting Management Plan prior to its implementation. The scope of work of the Beach Lighting Management Plan shall include, but is not limited to, the following items.

        a. Identify and map jurisdictional boundaries along the Volusia County coast.

        b. Categorize coastal areas of the County with respect to existing lighting environments. Categories will consider type and extent of upland development, amount and intensity of beachfront lighting, sea turtle nesting densities, and relative effort and expense required to meet appropriate lighting standards.

        c. Determine the adequacy of existing ordinances and codes within each jurisdiction as well as the adequacy of related enforcement programs in protecting nesting and hatchling sea turtles from beachfront lighting.

        d. Develop an approach for addressing lighting issues for each coastal lighting category. Where modifications are impractical or cost prohibitive, develop mitigation guidelines that will yield greater cost/benefit ratios.

        e. Develop a protocol for detailed lighting evaluations along those sections of coastline where lighting modifications are feasible and cost effective.

16

f.      If it is determined that lighting ordinances will be cost effective and can be practically implemented in the currently exempt areas of Daytona Beach and Daytona Beach Shores, then coordinate the development of new ordinances in those municipalities.

g.      Develop a program for assisting coastal property owners in bringing lights into compliance with local ordinances or Florida Department of Environmental Protection guidelines.

h.      Develop a generic public awareness program for promoting turtle-friendly lighting and voluntary compliance with light management guidelines.

i.      Develop a long-term program for annual maintenance lighting evaluations.

The time frame for developing scope of work for the Beach Lighting Management Plan is one year from adoption of the [habitat conservation plan]. The Beach Lighting Management Plan will be implemented during the second and third years following adoption.  Lighting inventories will be conducted during the first year of implementation. The annual lighting maintenance program will be initiated during the third year after [habitat conservation plan] adoption, and a mitigation plan for uncorrectable lighting problems will be implemented during the fourth and fifth years following adoption.

ii.      **Lighting Surveys.**  By April 1, 1997, Permittee shall develop, with further consultation and assistance from the U.S. Fish and Wildlife Service and Florida Department of Environmental Protection, a methodology for implementing and citing light sources that disorient sea turtles. Permittee will conduct lighting surveys and compile lists of infractions for Code Enforcement action or referral to the U.S. Fish and Wildlife

17

Service.  Lighting surveys will be conducted monthly, at a minimum, from April 1 through October 31 of each year.

iii.  **County-owned and Operated Lights.**  The Permitee will survey all beachfront lights owned or operated by Volusia County to identify those that are not in compliance with State guidelines.  The Permittee will ensure that the individual responsible for surveying the lights coordinates with the U.S. Fish and Wildlife Service for concurrence with the results.  Any lights deemed to be a problem for sea turtles as a result of the survey will be brought into compliance by the County.  The U.S. Fish and Wildlife Service will be notified to conduct a survey to ensure compliance; Volusia County personnel or their contractor will be present for the survey.  All of the above measures will take place prior to May 1, 1997.

iv.  **Light Management Training.**  By July 1, 1997, the Permittee will establish a training manual and hold at least two Permittee-sponsored workshops on lighting and beach crime to provide information on the effects of lighting in compliance with Volusia County Code protecting sea turtles and crime occurrences.

Condition G does not contain any language expressly authorizing takes of sea  turtles through artificial beachfront lighting like that contained within Condition F.

In light of the foregoing, it is readily apparent that the incidental take permit exhaustively lists all authorized activities within Condition F and all mitigation measures within Condition G. Activities relative to driving on the beach are mentioned in both conditions.  Activities relative to artificial beachfront lighting, however, are mentioned only in Condition G.  Given the permit's structure, the express authority to take sea turtles through artificial beachfront lighting -- if the Service had so intended -- would be memorialized in Condition F.  This absence is

18

dispositive. Accordingly, Volusia County lacks the Service's express permission to take sea turtles incidentally through artificial beachfront lighting.

Volusia County argues that even if it lacks the Service's express permission, it has the Service's implied permission to take sea turtles incidentally through artificial beachfront lighting because the Service expressly conditioned the permit on Volusia County's implementation of detailed lighting-related mitigatory measures. This argument presents an issue of first impression in this and other circuits, whether the incidental take permit exception (16 U.S.C. § 1539(a)) to the "take" prohibition (16 U.S.C. § 1538(a)(1)(B)) applies to, and thus excepts from liability, an activity performed as a purely mitigatory measure upon which the Service conditions the permit. We hold that it does not.

The ESA's text and the Service's regulations provide every indication that incidental take permission must be express and activity-specific. To be excepted from liability, the ESA mandates that the "take" be "incidental to . . . the carrying out of an . . . <u>activity</u>." 16 U.S.C. § 1539(a)(1)(B) (emphasis added). Moreover, in addressing the requirements of the habitat conservation plan, the ESA semantically separates the "action[]" at issue from the applicant's intentions to "mitigate" the taking. <u>Compare</u> 16 U.S.C. § 1539(a)(2)(A)(iii) ("what alternative <u>actions</u> to such taking the applicant considered") (emphasis added) <u>with</u> 16 U.S.C. § 1539(a)(2)(A)(ii) ("what steps the applicant will take to minimize and <u>mitigate</u> such impacts") (emphasis added). <u>See generally</u> <u>Friends of Endangered Species, Inc. v. Jantzen</u>, 760 F.2d 976, 984 (9th Cir. 1985) (separating semantically the activity for which the applicants sought an incidental take permit -- a development "project" -- from the mitigatory measures -- "restrictions" on the development). Furthermore, before the Service issues an incidental take permit, the fact-finding official must resolve at least two statutorily distinct questions: (1)

19

whether the <u>activity</u> will be free of purposeful takes; and (2) whether the applicant will <u>mitigate</u> the authorized takes' effect.  <u>Compare</u> 16 U.S.C. § 1539(a)(2)(B)(i) ("the <u>taking</u> will be incidental") (emphasis added) <u>with</u> 16 U.S.C. § 1539(a)(2)(B)(ii) ("the applicant will . . . minimize and <u>mitigate</u> the impacts of such taking") (emphasis added).

The statutory dividing line between activities sought to be permitted and mitigatory measures is further reinforced in the Service's regulations.  The Service requires applicants to describe completely "the <u>activity</u> sought to be authorized."  50 C.F.R. §§ 17.22(b)(1)(i), 17.32(b)(1)(iii)(A) (emphasis added); <u>see also</u> 50 C.F.R. § 222.22(b)(4) (incidental take permit applications to the National Marine Fisheries Service must include a "detailed description of the proposed <u>activity</u>") (emphasis added).[10]  The incidental take permit, in turn, "may authorize a single transaction, a series of transactions, or a number of <u>activities</u>[.]"  50 C.F.R. §§ 17.22, 17.32 (emphasis added).  Finally, the Service emphasizes that the "authorizations on the face of a permit which set forth specific . . . <u>methods of taking</u> . . . are to be strictly construed and shall not be interpreted to permit similar or related matters outside the scope of strict construction."  50 C.F.R. § 13.42 (emphasis added); <u>see also</u> 50 C.F.R. § 222.22(d) (incidental take permits that the National Marine Fisheries Service issues must "contain such terms and conditions as the Assistant Administrator deems necessary and appropriate, including . . . [t]he authorized <u>method of taking</u>") (emphasis added).

Even the Service's informal publication advises applicants to describe specifically "all <u>actions</u> . . . that . . . are likely to result in incidental take" so that the permit holder "can determine the applicability of the incidental take authorization to the <u>activities</u> they undertake."

_____

[10]  Although the National Marine Fisheries Service did not issue the permit in this case, its regulations are substantially similar to those of the Fish and Wildlife Service.

20

United States Fish & Wildlife Serv., Dep't of the Interior; Nat'l Marine Fisheries Serv., Dep't of Commerce, Habitat Conservation Planning Handbook (Nov. 1996), at 3-12 to 3-13 (emphasis added). Otherwise, the Service warns, "broadly defined types of <u>activities</u> . . . generally would not be authorized." Habitat Handbook, at 3-13 (emphasis added).[11]

The content of Volusia County's application and correspondence with the Service reflects the statutory and regulatory dividing line between authorized activities and mitigatory measures. In its initial application to the Service, Volusia County "complete[ly] describ[ed] . . . the activity sought to be authorized" as "vehicular access to Volusia County beaches[.]" (Citing 50 C.F.R. §§ 17.22(b)(1)(i).) A follow-up letter from a Service official acknowledging receipt of the application summarized that Volusia County sought "a permit to cover any incidental take of sea turtles that may occur on Volusia County beaches . . . as a result of <u>vehicular access</u> to county beaches." (Emphasis added.) Another follow-up letter from the Service pointedly expressed that

> it is important to state for the record that the County of Volusia is not seeking incidental take authority for marine sea turtles resulting from lights owned or operated by the County. The purpose of any such discussion in the habitat conservation plan . . . is to provide <u>mitigation</u> for impacts to marine sea turtles resulting from <u>permitted activities</u>. The [incidental take permit] application

_____

[11] We recognize that some language in this informal publication potentially contradicts our holding. The Service posits that "[w]hat is being authorized in [an incidental take] permit is incidental take, not the activities that result in the take." Habitat Handbook, at 3-12. Also, the Service opines that "actions that result in deliberate take can be conducted under an incidental take permit, <u>if</u>: (1) the take results from mitigation measures . . . specifically described in the [habitat conservation plan]; and (2) such activities are directly associated in time or place with activities authorized under the permit." Habitat Handbook, at 7-2. The Service's informal publications are, of course, not binding authority. See CWT Farms, Inc. v. Commissioner, 755 F.2d 790, 803-04 (11th Cir. 1985), cert. denied, 477 U.S. 903 (1986). We also find these excerpts unpersuasive since they conflict with the publication's other provisions and the Service's duly-promulgated regulations.

21

you submitted requests incidental take authority for sea turtle species from <u>beach-driving</u> and associated activities only.

(Emphasis added.)  Finally, in a responsive letter to the Service, an assistant county attorney reiterated that "Volusia County is seeking an Incidental Take Permit for vehicles [sic] access to the beaches.  However, Volusia County has addressed lighting throughout its permit application as a <u>mitigating</u> factor."  (Emphasis added.)

Contrary to Volusia County's position, no published case law even purports to suggest that purely mitigatory measures fall within the scope of the incidental take permit exception, 16 U.S.C. § 1539(a).  In <u>Ramsey v. Kantor</u>, the Ninth Circuit addressed whether the States of Oregon and Washington that were neither federal agencies nor applicants for an incidental take statement issued under 16 U.S.C. § 1536(b) may lawfully take federally protected fish without first obtaining an incidental take permit under 16 U.S.C. § 1539(a).  96 F.3d 434, 437 (9th Cir. 1996).[12]  The court answered the question in the affirmative "provided the actions in question are

---

[12]  The Supreme Court recently explained the incidental take statement exception:

> If a [federal] agency determines that action it proposes to take may adversely affect a listed species, it must engage in formal consultation with the Fish and Wildlife Service, as delegate of the Secretary [of the Interior], after which the Service must provide the agency with a written statement (the Biological Opinion) explaining how the proposed action will affect the species or its habitat . . . . [I]f the Biological Opinion concludes that the agency action will not result in jeopardy or adverse habitat modification, or if it offers reasonable and prudent alternatives to avoid that consequence, the Service must provide the agency with a written statement (known as the "<u>Incidental Take Statement</u>") specifying the "impact of such incidental taking on the species," any "reasonable and prudent measures that the [Service] considers necessary or appropriate to minimize such impact," and setting forth "the  terms and conditions . . . that must be complied with by the Federal agency . . . to implement [those measures]."

Bennett v. Spear, 117 S. Ct. 1154, 1159 (1997) (citations omitted and emphasis added).

22

contemplated by an incidental take statement issued under [16 U.S.C. § 1536(b)] and are conducted in compliance with the requirements of that statement." Ramsey, 96 F.3d at 442. Because the incidental take statement "clearly anticipated" that Oregon and Washington would regulate the fishing of unprotected salmon, the court held that those states were not liable for takes of endangered and threatened salmon that "intermingle with and are all but indistinguishable from" unprotected salmon. Ramsey, 96 F.3d at 438, 442.

Volusia County argues that the Service "clearly anticipated" takes resulting from artificial beachfront lighting in the incidental take permit, just as the issuing agency in Ramsey "clearly anticipated" takes resulting from salmon fishing regulations in the incidental take statement. 96 F.3d at 442. We are not convinced. As a threshold matter, the Ramsey court gave no indication that Oregon's and Washington's salmon fishing regulations served as purely mitigatory measures, as does Volusia County's artificial beachfront lighting activities.

In any event, the law governing incidental take statements issued under 16 U.S.C. § 1536(b), the statutory source in Ramsey, differs from the law governing incidental take permits issued under 16 U.S.C. § 1539(a), the statutory source in this case. See generally Ramsey, 96 F.3d at 439. First, the issuing agency's prerequisite findings are not the same. To permit an incidental taking under 16 U.S.C. § 1536(b), the issuing agency must conclude, in pertinent part, that:

> [1] the agency action will not [likely jeopardize the continued existence of any protected species or result in the destruction or adverse modification of its critical habitat ("likely jeopardize protected species")], or [the agency] offers reasonable and prudent alternatives which the Secretary believes would not [jeopardize protected species]; [and]
> [2] the taking of an endangered species or a threatened species incidental to the agency action will not [likely jeopardize protected species][.]

23

16 U.S.C. § 1536(b)(4) (incorporating by reference 16 U.S.C. § 1536(a)(2)).[13] To permit an incidental taking under 16 U.S.C. § 1539(a), however, the issuing agency must find, in pertinent part, that:

> [1] the taking will be incidental;
> [2] the applicant will . . . minimize and mitigate the impacts of such taking;
> [3] the applicant will ensure that adequate funding for the [habitat conservation] plan will be provided;
> [4] the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and
> [5] the [other measures that the issuing agency may require] will be met[.]

16 U.S.C. § 1539(a)(2)(B) (incorporating by reference 16 U.S.C. § 1539(a)(2)(A)(iv)).  Both, of course, require a finding that the take sought to be authorized will be "incidental."  Both also focus on the ultimate effect of the incidental take on the species.  See 16 U.S.C. § 1539(a)(2)(B)(iv) ("the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild"); 50 C.F.R. § 402.02 (proposed action "jeopardizes" the species at issue if it can "reasonably . . . be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species").  Only 16 U.S.C. § 1539, however, expressly requires a finding of future mitigation.[14]  As such, the holding of Ramsey -- that a non-

---

[13]  Not relevant to this case, a third finding is required if "a marine mammal is involved."  16 U.S.C. § 1536(b)(4)(C) (incorporating by reference 16 U.S.C. § 1371(a)(5), a section of the Marine Mammal Protection Act, 16 U.S.C. §§ 1361-1407).

[14]  It is true the issuing agency must condition the incidental take statement on the implementation of quasi-mitigatory "reasonable and prudent measures" that the agency deems "necessary or appropriate to minimize" the impact of the incidental take on the species.  16 U.S.C. § 1536(b)(4)(ii); e.g., Center for Marine Conservation v. Brown, 917 F. Supp. 1128, 1148-49 (S.D. Tex. 1996) (discussing "reasonable and prudent measures" to keep sea turtle mortalities from exceeding the levels established in an incidental take statement).  This, however, is not the same as an express finding that "the applicant will  . . . minimize and mitigate the impacts of" the incidental take.  16 U.S.C. § 1539(a)(2)(B)(ii) (emphasis added).  The

24

applicant's actions can be excepted from take liability if they are contemplated in an incidental take statement -- cannot fairly be read to apply to mitigatory measures contemplated in an incidental take permit. See 96 F.3d at 442.

A second important difference between an incidental take statement (16 U.S.C. § 1536(b)) and an incidental take permit (16 U.S.C. § 1539(a)) lies in the broad language of 16 U.S.C. § 1536(o), which applies only to holders or beneficiaries of the former. Under section 1536(o), "any taking that is in compliance with the terms and conditions specified in [an incidental take statement issued under 16 U.S.C. § 1536(b)] shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2).[15] No similar provision applies to "any" taking in compliance with an incidental take permit's terms and conditions, including mitigatory measures. The closest analogous provision in section 1539 appears only in the converse: the issuing official "shall revoke [an incidental take permit] if he finds that the permittee is not complying with the terms and conditions of the permit." 16 U.S.C. § 1539(a)(2)(C).[16]

_____

Ramsey court gave no indication that Oregon's and Washington's salmon regulations were "reasonable and prudent measures" upon which the issuing agency conditioned the incidental take statement.

[15] Construing this statutory language as broad, the Ramsey court extended incidental take statement protection to entities that were neither applicants nor federal agencies. Ramsey, 96 F.3d at 441 ("[Section 1536(o)(2)] indicates that any taking -- whether by a federal agency, private applicant, or other party -- that complies with the conditions set forth in the incidental take statement is permitted.").

[16] We are aware that the Ramsey court noted that "[i]f the private party complies with the requirements of the incidental take permit, any taking of a listed species will not violate [16 U.S.C. § 1538(a)(1)(B)]." 96 F.3d at 439 n.6 (emphasis added). The court, however, framed this unpersuasive dicta too broadly. No support for this notion can be drawn from the only authority that the Ramsey court cited, 16 U.S.C. § 1539(a)(1)(B). Wisely, Volusia County abandoned its previous reliance on this footnote. Even if this footnote somehow accurately reflected the law, we have found that any takes of sea turtles through artificial beachfront lighting do not "comply"

25

Finally, the prohibitions that underlie the incidental take exceptions are unique. The prohibition that underlies the incidental take statement exception applies only to federal agencies, and imposes upon them a duty to consult with the statement-issuing agency and ensure that their proposed action will not likely "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat[.]" 16 U.S.C. § 1536(a)(2) (the "jeopardy" clause). The prohibition that underlies the incidental take permit exception applies to federal, state, local and private actors, and creates no similar duty to consult. See 16 U.S.C. §§ 1532(13), 1538(a)(1)(B) (the "take" prohibition). Additionally, the "jeopardy" clause applies to protected fish, wildlife and plants, whereas the "take" prohibition applies only to protected fish and wildlife. See 16 U.S.C. §§ 1532(16), 1536(a)(2), 1538(a)(1). Consequently, some activities -- especially those relating to land use -- are more likely to result in "jeopardy" than a "take." See Sweet Home, 115 S. Ct. at 2415 ("Section 7 [16 U.S.C. § 1536] imposes a broad, affirmative duty to avoid adverse habitat modifications that § 9 [16 U.S.C. § 1539] does not replicate, and § 7 does not limit its admonition to habitat modification that actually kills or injures wildlife.") (internal quotation marks and citations omitted); Andrew J. Doyle, Note, Sharing Home *Sweet Home* with Federally Protected Wildlife, 25 Stetson L. Rev. 889, 911 n.174 (1996) ("[I]t is easier to 'jeopardize' than it is to 'harm.'"). These differences further militate against broadening the scope of the incidental take permit exception (16 U.S.C. § 1539(a)) even if some courts have suggested that section 1536(*o*) serves to broaden the scope of the incidental take statement exception (16 U.S.C. § 1536(b)). See Ramsey, 96 F.3d at 441 ("[A]ny taking . . . that complies with the conditions set forth in the incidental take statement is permitted."). See generally Mount Graham Red Squirrel

with the terms and conditions of the Volusia County's incidental take permit.

26

v. Espy, 986 F.2d 1568, 1580 (9th Cir. 1993) ("Under [16 U.S.C. § 1536], . . . limited takings may be permitted if they are incorporated into the 'terms and conditions' of a Reasonable and Prudent Alternative drawn up in connection with the issuance of a Biological Opinion.").

The fact remains that no court has been presented with the issue facing us today. To be sure, protecting troubled wildlife is serious business. See Tennessee Valley Auth. v. Hill, 437 U.S. 153, 174 (1978) ("[T]he language, history, and structure of the [Endangered Species Act] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities."); Strahan v. Linnon, 967 F. Supp. 581, 618 (D. Mass. 1997) ("The Endangered Species Act is a powerful and substantially unequivocal statute."). Consequently, permits that purport to excuse takes of wildlife must be clear on their face. See 50 C.F.R. § 13.42 ("The authorizations on the face of a permit which . . . permit a specifically limited matter[] are to be strictly construed[.]"); see also 50 C.F.R. § 220.42. In this case, "the Secretary . . . permit[ted]" only takes of sea turtles incidental to driving on the beach. 16 U.S.C. § 1539(a)(1). Accordingly, the district court erred in dismissing the Turtles' claim that artificial beachfront lighting takes sea turtles.[17]

---

[17] We agree with the district court that contrary to Volusia County's cursory contention, "the doctrine of primary jurisdiction is inapplicable to the present case." Loggerhead Turtle v. County Council of Volusia County, Fla., 896 F. Supp. 1170, 1177 (M.D. Fla. 1995) (citing United States v. Western Pacific R.R., 352 U.S. 59, 63-64 (1956)).

We also summarily reject Volusia County's argument that its mitigatory measures render moot any remedy that the Turtles could possibly seek, short of a total blackout on the beach. The effectiveness of these mitigatory measures -- that the Turtles dispute with record evidence -- is an issue that can be resolved only at trial.

Finally, Volusia County erroneously contends that the Turtles' appeal is an attempt to circumvent the Administrative Procedure Act, 5 U.S.C. § 551, et seq. Unlike the environmental group in Friends, the Turtles do not challenge the Service's issuance of the incidental take permit. See 760 F.2d at 981, 982. The Turtles assume the validity of the Service's permit decision in contending that Volusia County lacks the Service's permission to take sea turtles

27

**B.**

"To satisfy the 'case' or 'controversy' requirement of Article III, which is the 'irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." Bennett v. Spear, 117 S. Ct. 1154, 1161 (1997) (citations omitted). The district court found that the Turtles failed to satisfy both the "fairly traceable" and "redressability" prongs of the standing doctrine to complain of the "harm" that artificial beachfront lighting causes them within the municipalities of Daytona Beach, Daytona Beach Shores, Ormond Beach and New Smyrna Beach. Those municipalities -- not parties to this case -- each possess at least some degree of regulatory authority and enforcement control over public and private artificial beachfront lighting within their borders.

**1.**

"The fairly traceable element explores the causal connection between the challenged conduct and the alleged harm." Federal Deposit Ins. Corp. v. Morley, 867 F.2d 1381, 1388 (11th Cir.), cert. denied, 493 U.S. 819 (1989). Essentially, "this requirement focuses on whether the line of causation between the illegal conduct and injury is too attenuated." Morley, 867 F.2d at 1388 (internal quotation marks and citations omitted). The causal link may become "too attenuated" if the injury is "the result of the independent action of some third party not before the court." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotation marks and

---

through artificial beachfront lighting. See generally United States v. St. Onge, 676 F. Supp. 1044, 1045 (D. Mont. 1988) ("[T]he court intends to instruct the jury that the government must prove three elements beyond a reasonable doubt in order for the defendant to be convicted: first, that the defendant knowingly took an animal within the United States; second, that the animal was a grizzly bear; and third, that the defendant did not have permission from the United States Department of the Interior to take the bear.") (emphasis added).

28

alterations omitted).  On the other hand, standing is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties.  See generally Lujan, 504 U.S. at 560 (injury cannot be the result of "independent" third party action).

We are not asked to trace to Volusia County the Turtles' alleged "harm" in unincorporated beach communities like Wilbur-by-the-Sea, Ormond-by-the-Sea and Bethune Beach, as well as the incorporated Town of Ponce Inlet.  Indisputably, Volusia County possesses exclusive local regulatory and enforcement control over artificial beachfront lighting in those locations.  Instead, we are asked to review whether a "causal connection" exists between Volusia County's regulatory action and the Turtles' alleged "harm" within the municipalities of Daytona Beach, Daytona Beach Shores, Ormond Beach and New Smyrna Beach.  Morley, 867 F.2d at 1388.  To answer this question, we examine Volusia County's charter and its artificial beachfront lighting ordinances.

Volusia County's charter requires it to protect the environment through county-wide ordinance:

> The council . . . shall establish minimum standards . . . for the protection of the environment . . . . by ordinance.  Such standards . . . shall apply within all the incorporated and unincorporated areas of Volusia County.  In the event of a conflict between any standard . . . established by a County ordinance, the County ordinance shall prevail within the municipality to the extent of any conflict; provided, however, the governing body of each municipality may establish more restrictive standards . . . within the municipality for the protection of the environment.

Volusia County, Fla., Home Rule Charter, Art. II, § 202.4 (1989); see generally City of Ormond Beach v. County of Volusia, 535 So. 2d 302, 303 & n.3 (Fla. 5th D.C.A. 1988) (discussing "charter counties such as Volusia" and noting that "[t]he charter provides that the county's ordinances prevail if it sets minimal standards protecting the environment by prohibiting or

29

regulating air or water pollution or the destruction of the resources of the county belonging to the general public") (internal quotation marks omitted).[18]

To this aim, in December 1989, Volusia County enacted Ordinance 89-60, entitled "Minimum Environmental Standards for Sea Turtle Protection." Volusia County, Fla., Ordinance No. 89-60, § 2 (1989). Seeking generally to "minimiz[e] the artificial light on the beaches[,]" the ordinance classifies its restrictions into three categories: (1) lights associated with new development; (2) lights associated with existing development; and (3) lights that are publicly owned. Volusia County, Fla., Ordinance No. 89-60, § 2 (amending Ordinance No. 88-15, Art. VI, §§ 601, 603, 604, 606 (1988)). The substance of these restrictions does not concern us today.[19] What is important, however, is where the restrictions apply. The ordinance's restrictions on new development apply county-wide, unless a municipality timely submits a proposed ordinance of its own that the county council determines to be in compliance with Ordinance 89-60's minimum standards. Volusia County, Fla., Ordinance No. 89-60, § 2 (amending Ordinance No. 88-15, Art. VI, §§ 603, 609). All the municipalities at issue (Daytona Beach, Daytona Beach Shores, Ormond Beach and New Smyrna Beach) have elected to either enact and enforce a complying ordinance of their own as to new development or submit to Volusia County's enforcement of Ordinance 89-60 within their borders.

---

[18] Volusia County's charter became effective January 1, 1971.

[19] The record reveals that Volusia County later repealed Ordinance 89-60 and immediately readopted, with some "turtle-friendlier" changes, the "Minimum Environmental Standards for Sea Turtle Protection." See Volusia County, Fla., Ordinance Nos. 95-10, 95-18 (1995). According to the Turtles' brief, Volusia County further amended those minimum standards in an ordinance dated August 25, 1995. See Volusia County, Fla., Ordinance No. 95-30. For simplicity's sake, we will refer to the current version of the Minimum Environmental Standards for Sea Turtle Protection as "Ordinance 89-60, as amended."

30

The majority of allegedly "harmful" lighting, however, stems from existing development and public lighting. The Minimum Environmental Standards for Sea Turtle Protection pertaining to existing development and public lighting do not apply at all to Daytona Beach and Daytona Beach Shores. See Volusia County, Fla., Ordinance No. 89-60, § 2 (amending Ordinance No. 88-15, Art. VI, §§ 602, 604, 606). Those two municipalities' beaches, according to Volusia County's ordinance, are not "utilized or likely to be utilized[] by sea turtles for nesting[.]" Volusia County, Fla., Ordinance No. 89-60, § 2 (amending Ordinance No. 88-15, Art. VI, § 602). According to the Turtles' complaint and the incidental take permit, neither municipality has enacted any lighting restrictions.

As to other incorporated areas of Volusia County, the Minimum Environmental Standards for Sea Turtle Protection pertaining to existing development and public lighting apply unless a municipality submits a proposed ordinance of its own that the county council determines to be in compliance with Ordinance 89-60's minimum standards. See Volusia County, Fla., Ordinance No. 89-60, § 2 (amending Ordinance No. 88-15, Art. VI, §§ 604, 606, 609). Ormond Beach and New Smyrna Beach are two municipalities that enforce their own county-approved version of Ordinance 89-60, as amended.

Volusia County later enacted its own artificial beachfront lighting ordinance that exceeded the minimum standards established in Ordinance 89-60, as amended. See Volusia County, Fla., Ordinance No. 90-22, § 3 (1990) (amending Ordinance No. 88-3, Art. XII, §§ 1201-1206). Ordinance 90-22 applies to unincorporated beach communities of Volusia County like Wilbur-by-the-Sea, Ormond-by-the-Sea and Bethune Beach, as well as the incorporated Town of Ponce Inlet. Exempted from Ordinance 90-22 are Daytona Beach, Daytona Beach Shores and "any incorporated areas of Volusia County which have adopted the . . . Minimum

31

Environmental Standards for Sea Turtle Protection[,]" such as Ormond Beach and New Smyrna Beach. Volusia County, Fla., Ordinance No. 90-22, § 3 (amending Ordinance No. 88-3, Art. XII, § 1202). In comparison with Ordinance 89-60, as amended, Ordinance 90-22 appears "turtle-friendlier." For example, Ordinance 90-22 requires most lights to be turned off at sunset rather than 8:30 p.m. during the nesting season. Compare Volusia County, Fla., Ordinance No. 90-22, § 3 (amending Ordinance No. 88-3, Art. XII, §§ 1203-1205) with Volusia County, Fla., Ordinance No. 95-18, §§ 4-6.

The Turtles' theory of causation is twofold. First, they contend that Volusia County's exempting Daytona Beach and Daytona Beach Shores from all lighting restrictions, including the Minimum Environmental Standards for Sea Turtle Protection in Ordinance 89-60, as amended, serves as a cause-in-fact of their "harm" in those two municipalities. Similarly, they contend that Ordinance 89-60, as amended, and Ordinance 90-22 are causally connected to their "harm" in Ormond Beach and New Smyrna Beach since they allow those municipalities to retain only the allegedly deficient Minimum Environmental Standards for Sea Turtle Protection. The second -- and presently unchallenged -- prong of the Turtles' theory of causation builds on their first, positing that even if Ordinance 90-22 applied county-wide, its restrictions are too lax to prevent takes. Mentioning only Daytona Beach and Daytona Beach Shores, Volusia County responds that it cannot be liable for takes in those locations because it "had no authority to regulate lighting within those municipalities" and "in no way authorized any activity by either of those municipalities that could have resulted in harm to the turtles."[20]

---

[20] Volusia County's brief does not specifically mention Ormond Beach or New Smyrna Beach.

We agree with the Turtles that they have shown a sufficient causal connection to seek to hold Volusia County liable for "harmfully" inadequate regulation of artificial beachfront lighting in the non-party municipalities of Daytona Beach, Daytona Beach Shores, Ormond Beach and New Smyrna Beach. First, Volusia County possesses primary authority to regulate artificial beachfront lighting county-wide. The county charter expressly grants Volusia County the authority – and arguably a duty – to "establish minimum standards . . . for the protection of the environment . . . . by ordinance" that "apply within all the incorporated and unincorporated areas of Volusia County." Volusia County, Fla., Home Rule Charter, Art. II, § 202.4. Volusia County did just that. It mandated a floor of, that is, minimum, lighting standards that Ormond Beach and New Smyrna Beach must implement and enforce. Similarly, based on an ordained finding (in both Ordinance 89-60, as amended, and Ordinance 90-22) that sea turtles do not nest or likely nest in Daytona Beach and Daytona Beach Shores, Volusia County decided that no lighting restrictions should apply to them.[21] See Volusia County, Fla., Ordinance No. 89-60, § 2 (Daytona Beach and Daytona Beach Shores are not "utilized or likely to be utilized[] by sea turtles for nesting") (amending Ordinance No. 88-15, Art. VI, § 602). That Ormond Beach and New Smyrna Beach have the supplemental authority to enact more onerous, and Daytona Beach and Daytona Beach Shores could decide to enact some, lighting standards do not sever the "fairly traceable" connection between Volusia County's regulatory actions and the Turtles' alleged "harm."

_____

[21] The Turtles argue that exempting Daytona Beach and Daytona Beach Shores from the Minimum Environmental Standards for Sea Turtle Protection violates the county charter. We will not consider this argument because it "was not presented to the district court and on appeal is raised for the first time in the reply brief." United States v. Campo, 793 F.2d 1251, 1252 (11th Cir.), cert. denied, 479 U.S. 938 (1986). We therefore treat as uncontested the district court's conclusion that Volusia County's enaction of the ordinances at issue was valid under its charter and state law.

33

The only truly "independent action[s]" are Ormond Beach's and New Smyra Beach's enforcement of the Minimum Environmental Standards for Sea Turtle Protection.[22] Lujan, 504 U.S. at 560 (internal quotation marks and citations omitted). In contrast to its charter-based authority to set minimum standards for artificial beachfront lighting, Volusia County does not possess any control over the actual, day-to-day enforcement measures that Ormond Beach and New Smyrna Beach employ. Ordinance 89-60, as amended, states that Ormond Beach and New Smyrna Beach

> shall . . . submit to the county council[] [their] ordinance[s] containing the standards in [the Minimum Environmental Standards for Sea Turtle Protection]; provided, however, . . . [Ormond Beach and New Smyrna Beach] may elect to authorize the county to administer [the Minimum Environmental Standards for Sea Turtle Protection] within [their borders]. . . . If such ordinance[s] . . . [are] not in compliance with [the Minimum Environmental Standards for Sea Turtle Protection], then, . . . the county council may enforce [the Minimum Environmental Standards for Sea Turtle Protection] in [Ormond Beach and New Smyrna Beach].

Volusia County, Fla., Ordinance No. 95-18, § 3 (emphasis added). Therefore, the Turtles lack standing to seek to hold Volusia County responsible for inadequate enforcement efforts on the part of Ormond Beach and New Smyrna Beach.

This absence of enforcement control on Volusia County's part, however, does not defeat the Turtles' standing to sue for inadequate regulation, the Turtles' core theory of causation in those two municipalities. At trial, the district court can simply assume full and complete enforcement efforts on the part of Ormond Beach and New Smyrna Beach. This assumption will focus the trier of fact solely on the regulatory acts of Volusia County in determining whether the

---

[22] The same holds true for Daytona Beach's and Daytona Beach Shores' enforcement of the Minimum Environmental Standards for Sea Turtle Protection pertaining to new development.

Minimum Environmental Standards for Sea Turtle Protection as contained within Ordinance 89-60, as amended, cause "harm" (e.g., insufficient on their face to prevent "harm") to sea turtles in Ormond Beach and New Smyrna Beach. See generally Lujan, 504 U.S. at 561 (the existence of standing "must be supported adequately by the evidence adduced at trial") (internal quotation marks and citations omitted). As a defense, of course, Volusia County may show that its Minimum Environmental Standards for Sea Turtle Protection as contained within Ordinance 89-60, as amended, if fully enforced, would prevent "harm" to the Turtles.

The trier of fact need not make any similar assumption with regard to Daytona Beach and Daytona Beach Shores. In exempting altogether those two municipalities from even the Minimum Environmental Standards for Sea Turtle Protection as contained within Ordinance 89-60, as amended, Volusia County obviously contemplated that they will not employ any enforcement measures. Furthermore, according to the complaint and the incidental take permit, nothing exists in those two municipalities to enforce. At trial, the trier of fact's inquiry can simply be whether the lack of artificial beachfront lighting restrictions in Daytona Beach and Daytona Beach Shores causes "harm" to sea turtles in those locations. As a defense, Volusia County may seek to prove the converse (e.g., protected sea turtles do not nest or shelter in those locations and/or unrestricted lighting does not "harm" them).

Because the district court dismissed the Turtles' claims of takes in Daytona Beach, Daytona Beach Shores, Ormond Beach and New Smyrna Beach for lack of standing, we need not decide whether the Turtles have made a sufficient showing of causation for purposes of liability. Nonetheless, precedent from the Supreme Court and other circuits that address causation for purposes of liability support our holding. In Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, the Supreme Court stated that the ESA's "harm" regulation

35

"encompasses <u>indirect</u> as well as direct injuries[.]" 115 S. Ct. at 2413 (emphasis added). Thus, under <u>Sweet Home</u>, Volusia County need not operate every beachfront lighting source itself to be held liable under the ESA. Rather, its indirect control over lighting is sufficient -- at the very least -- for purposes of standing.[23]

At least two circuits, the First and the Eighth, have held that the regulatory acts of governmental entities can cause takes of protected wildlife. <u>See</u> <u>Strahan v. Coxe</u>, 127 F.3d 155, 158, 163 (1st Cir. 1997) (state agency caused takings of the endangered right whale because it "licensed commercial fishing operations to use gillnets and lobster pots in specifically the

---

[23] In <u>Sweet Home</u>, the Supreme Court suggested that the ESA's "take" prohibition and the "harm" regulation "incorporate ordinary requirements of proximate causation and foreseeability." 115 S. Ct. at 2412 n.9. Strangely, the Turtles ask us to apply <u>Sweet Home</u>'s "proximate causation" excerpt to the "fairly traceable" prong of standing. We decline to do so. First, no authority even remotely suggests that proximate causation applies to the doctrine of standing. Second, this portion of <u>Sweet Home</u> is likely dicta since the only dispute in that case was a facial one, whether the Secretary of the Interior "reasonably construed the intent of Congress" in promulgating the "harm" regulation. 115 S. Ct. at 2418; <u>cf.</u> Marbled Murrelet v. Babbitt, 83 F.3d 1060, 1065 (9th Cir. 1996) ("The case involved a facial challenge to the Secretary's definition of 'harm.' To the extent the <u>Sweet Home</u> opinion may be read to say past injury is required before an injunction may issue, such statement is dictum."), <u>cert. denied</u>, 117 S. Ct. 942 (1997). <u>See generally</u> Andrew J. Doyle, Note, Sharing Home <u>Sweet Home</u> with Federally Protected Wildlife, 25 Stetson L. Rev. 889, 900-901, 920-924 (1996) (discussing the virtual absence of published case law explicitly applying the doctrines of proximate cause and foreseeability to the ESA's "take" prohibition or "harm" regulation, and recommending that courts treat <u>Sweet Home</u> merely "as a statutory construction case that upheld the validity of an agency's regulation" and look to other "take" and "harm" case law such as <u>Palila v. Hawaii Dep't of Land & Natural Resources</u>, 852 F.2d 1106 (9th Cir. 1988), where the plaintiff established causation through "proof that a [state agency's] sheep ate certain immature vegetation on which the endangered palila totally relied in its mature state[,]" to frame the element of causation). Even if the concept of proximate causation somehow governed our analysis, we note that it would not necessarily produce a result different from that of cause-in-fact. <u>See generally</u> Cox v. Administrator United States Steel & Carnegie, 17 F.3d 1386, 1399 (11th Cir. 1994) ("A proximate cause is not . . . the same thing as a sole cause."), <u>cert. denied</u>, 513 U.S. 1110 (1995).

manner that is likely to result in violation of [the ESA]"), petition for cert. filed, 66 U.S.L.W.

3605 (Mar. 6, 1998) (No. 97-1485); Defenders of Wildlife v. Administrator, Envtl. Protection

Agency, 882 F.2d 1294, 1300-01 (8th Cir. 1989) (federal agency caused takes of the endangered

black-footed ferret through its "decision to register pesticides" even though other persons

actually distributed or used the pesticides). In Defenders of Wildlife, federal law prohibited

farmers from using strychnine, a pesticide, unless the Environmental Protection Agency (EPA)

registered it. 882 F.2d at 1296. Although intended to kill non-endangered rodents such as

prairie dogs, strychnine was also killing endangered black-footed ferrets. 882 F.2d at 1297.

Environmental groups sued the EPA, alleging that its "continued registration of strychnine

resulted in poisonings of protected species under the ESA[.]" 882 F.2d at 1298. The Eighth

Circuit affirmed the district court's finding that the EPA violated the "take" prohibition, the only

ESA violation in dispute. 882 F.2d at 1300, 1303. The court held that "the continued

registration of a pesticide, as distinguished from the distribution or use of that pesticide, can

constitute an illegal taking under the ESA." 882 F.2d at 1300. As to causation, the court found a

"clear" relationship between the EPA's regulatory action -- the registration of strychnine -- and

ferret deaths. 882 F.2d at 1301.

This case, like Defenders of Wildlife, involves a regulatory entity that exerts control over

the use of something that allegedly takes protected wildlife. In both cases, the regulatory entity

purports to make lawful an activity that allegedly violates the ESA. In Defenders of Wildlife,

the EPA registered strychnine, allowing farmers to use it. In this case, Volusia County ordained

beachfront lighting, allowing landowners to use lights all day and all night (that is, in Daytona

Beach and Daytona Beach Shores) or use lights only during daylight hours and turn them off at

37

sunset (that is, in unincorporated areas and the Town of Ponce Inlet) or 8:30 p.m. (that is, in Ormond Beach and New Smyrna Beach).

Volusia County's attempt to distinguish materially Defenders of Wildlife is unpersuasive. Volusia County contends that, unlike the EPA, it is not directly responsible for protecting endangered species. Volusia County, however, is subject to the ESA's "take" prohibition in the exact same manner as the EPA. See 16 U.S.C. § 1532(13) ("person[s]" subject to the "take" prohibition include "any . . . agent . . . of the Federal Government" and "any . . . political subdivision of a State"); Tennessee Valley Auth. v. Hill, 437 U.S. 153, 184 (1978) ("All persons, including federal agencies, are specifically instructed not to 'take' endangered species[.]"); see also Sierra Club v. Martin, 110 F.3d 1551, 1555 (11th Cir. 1997). Furthermore, contrary to Volusia County's and the district court's view, that the EPA had a separate and distinct duty under the ESA to ensure that its decision would not likely jeopardize endangered species did not factor into the Defenders of Wildlife court's holding. See 16 U.S.C. § 1536(a)(2) (the "jeopardy" clause); Tennessee Valley, 437 U.S. at 184, 193 (holding that a federal entity's operation of a dam violated the "jeopardy" clause, and separately noting that "[w]e do not understand how [the federal entity] intends to operate [the dam] without 'harming' the snail darter[,]" a threatened fish). The parties in Defenders of Wildlife disputed the EPA's liability only under the "take" prohibition, not the "jeopardy" clause. See 882 F.2d at 1300, 1303. Volusia County also purports to differentiate the specificity of the EPA's regulatory action in relation to its own. In Defenders of Wildlife, the court affirmed a trial finding of liability. In this case, we reverse a pretrial finding of no standing. Thus, Volusia County's argument concerns not the "irreducible constitutional minimum of standing" but raises "questions of

38

proximity and degree" that are best saved for trial.  Bennett, 117 S. Ct. at 1161 (internal quotation marks omitted); Sweet Home, 115 S. Ct. at 2418.[24]

Even more persuasive than the Eighth Circuit's opinion in Defenders of Wildife is the First Circuit's opinion in Strahan v. Coxe, 127 F.3d 155 (1st Cir. 1997).  In Strahan, Massachusetts law prohibited fishing companies from using gillnet and lobster pot fishing equipment without a license.  A state agency "vested with broad authority to regulate fishing" issued the licenses and, through regulation, restricted the use of the fishing equipment only in certain areas.  127 F.3d at 159.  According to reports from the National Marine Fisheries Service, "entanglement with fishing gear is one of the leading causes of the depletion of the [endangered] Northern Right whale population[.]"  127 F.3d at 159.

A conservationist sued the state agency under the ESA, alleging that its continued licensing of fishing equipment caused "harm" to the right whale.  See 127 F.3d at 158.  The district court granted preliminary injunctive relief.  First, as a threshold matter, the district court concluded that the conservationist had standing to sue the state agency even though "[i]ndisputably, the actions of third parties not before the court -- commercial fishing . . . operations -- are the immediate cause of the harm to endangered whales[.]"  Strahan v. Coxe, 939 F. Supp. 963, 978 (D. Mass. 1996), aff'd in part, vacated in part on other grounds, 127 F.3d 155 (1st Cir. 1997).  The district court found a sufficient causal connection between the alleged "harm" to whales and the agency's licensing of fishing equipment, pointing to the fact that "[f]ishing vessels cannot, legally, place gillnets and lobster gear in Massachusetts waters without permission from [the agency]."  939 F. Supp. at 978.  Reaching the merits of the ESA taking

---

[24] Again, we leave it to the district court to decide the standard for causation for purposes of liability.  We have framed the causation inquiry only to sever out the independent actions of non-parties that we cannot fairly trace to Volusia County.

claim, the district court found that the agency's "commercial fishing regulatory scheme likely exacted a taking in violation of the ESA." 127 F.3d at 163 (emphasis added). Concerning causation as one of the essential elements of the "take" prohibition, the district court found it "irrelevant that [the agency's] permitting of commercial fishing gear is only an indirect cause of whale entanglement[.]" 939 F. Supp. at 985.

On appeal, the First Circuit affirmed the judgment of the district court with respect to its ESA holdings. See 127 F.3d at 158.[25] First, the court held that "a governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species may be deemed to have violated the provisions of the ESA." 127 F.3d at 163. Second, the court affirmed the district court's finding of causation, stating that "while indirect, [the harm] is not so removed [from the agency's regulatory action] that it extends outside the realm of causation as it is understood in the common law." 127 F.3d at 164. Finally, the court rejected the agency's analogy that its fishing equipment licensure "does not cause the taking any more than [the state's] licensure of automobiles and drivers solicits or causes federal crimes, even though automobiles it licenses are surely used to violate federal drug laws, rob federally insured banks, or cross state lines for the purpose of violating state and federal laws." 127 F.3d at 164. The court reasoned that, unlike the licensing of automobiles, the licensing of fishing equipment "does not involve the intervening independent actor [as] a necessary component" because "it is not possible for a licensed commercial fishing operation to use its gillnets or lobster pots in a manner permitted by the [state agency] without risk of violating the ESA by exacting a taking." 127 F.3d at 164.

---

[25] The First Circuit did not specifically address the district court's determination of standing.

Like the state agency in Strahan, Volusia County is alleged to be a "governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species[.]" Strahan, 127 F.3d at 163. Just as the Strahan agency was "vested with broad authority to regulate fishing" under state law, Volusia County is "vested with broad authority to regulate" artificial beachfront lighting under its charter and ordinances. 127 F.3d at 159. Volusia County would have us hold that Daytona Beach, Daytona Beach Shores, Ormond Beach and New Smyrna Beach are "intervening independent actor[s]" in the regulation of artificial beachfront lighting. 127 F.3d at 164. It is true that, as we concluded earlier, Ormond Beach and New Smyrna Beach independently enforce their county-approved lighting ordinances. In all other respects, however, no "intervening independent actor" exists concerning lighting standards and enforcement in Volusia County. As Volusia County concedes, it possesses sufficient regulatory and enforcement control over artificial beachfront lighting in all unincorporated areas and the Town of Ponce Inlet. But for Volusia County's regulatory determination that Daytona Beach and Daytona Beach Shores fall outside the sea turtle nesting areas, light users in those locations would be subject to at least the Minimum Environmental Standards for Sea Turtle Protection as contained within Ordinance 89-60, as amended. Just as it was impossible in Strahan "for a licensed commercial fishing operation to use its gillnets or lobster pots in a manner permitted by the [agency] without risk of violating the ESA[,]" a genuine issue of fact exists in this case that the lighting activities of landowners along Volusia County's beaches -- as authorized through local ordinance -- violate the ESA. 127 F.3d at 164. Accordingly, at the very least, the Turtles, analogous to the conservationist in Strahan, have standing to proceed against Volusia County for lighting-related "harm" in Daytona Beach, Daytona Beach Shores, Ormond Beach and New

41

Smyrna Beach -- even though the actions or inactions of those "third parties not before the court" may be another "cause of the harm[.]"  939 F. Supp. at 978.

**2.**

The "redressability" prong of the standing doctrine asks whether it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Lujan, 504 U.S. at 561 (internal quotation marks and citations omitted).  The Turtles' complaint prays for the district court to:  (1) declare that Volusia County's "refusal to eliminate those artificial beachfront light sources that . . . misorient sea turtles from May 1st through October 31st annually constitutes an unlawful 'taking' of the loggerhead and  green [sea] turtle"; and (2) enjoin permanently Volusia County "from permitting those artificial light sources that misorient sea turtles[.]"  Given the Turtles' record evidence, we easily conclude that if the district court were to grant the requested relief, fewer protected sea turtles would be "harmed" through misorientation.  Cf. Strahan, 939 F. Supp. at 979 ("If the [state agency] were to limit further[] or ban . . . the use of gillnets and lobster gear in Massachusetts waters, it is likely that fewer endangered whales would be harmed through entanglements.").

Although "redressability -- like the other prongs of the standing inquiry -- does not depend on the defendant's status as a governmental entity[,]" unique constitutional implications exist whenever a federal district court is asked to order a state entity to take regulatory action.  Steel Co. v. Citizens for a Better Env't, 118 S. Ct. 1003, 1017 n.5 (1998).  Volusia County argues that granting the requested relief, that is, enjoining it from permitting "harmful" lighting, would be tantamount to ordering it to legislate in violation of the separation of powers.[26]  As the

_____

[26] Unlike the defendants in Strahan, Volusia County does not assert Tenth or Eleventh Amendment immunity.  See 127 F.3d at 166-71.  Nor does Volusia County raise federalism concerns.

42

Turtles correctly point out, however, we need not find constitutional every conceivable remedy within the "full scope of traditional equitable injunctive powers" available to the district court. Strahan, 127 F.3d at 170. Rather, we need only find constitutional at least one available remedy that would adequately bring about Volusia County's compliance with the ESA. See Strahan, 127 F.3d at 171 ("The district court was not required to go any farther than ensuring that any violation would end.").

Assuming, without deciding, that ordering Volusia County to implement and enforce county-wide a "turtle-friendlier" ordinance would violate the separation of powers, we find that alternative effective relief exists. The injunctive relief awarded in Defenders of Wildlife and Strahan is instructive. In Defenders of Wildlife, the district court "basically enjoined the EPA from continuing its registration of strychnine until the EPA could do so without illegally taking protected species of wildlife." 882 F.2d at 1298; see also National Wildlife Fed'n v. Hodel, No. S-85-0837 EJG, 23 Env't Rep. Cas. (BNA) 1089 (E.D. Cal. Aug. 26, 1985) (ordering the Secretary of the Interior and the Director of the Service to ban lead-shot bird hunting in portions of California, Illinois, Missouri, Oklahoma and Oregon based on a finding that their continued authorization caused takes of threatened bald eagles that ate lead-infested prey). In Strahan, the district court ordered the state agency to: (1) apply for an incidental take permit; (2) submit to the court a proposal "to restrict, modify or eliminate the use of fixed-fishing gear" in the endangered right whale's habitat; and (3) convene a committee that includes the plaintiff and other interested parties "to engage in substantive discussions . . . regarding modifications of fixed-fishing gear and other measures to minimize actual harm to the Northern Right whales[.]" 127 F.3d at 158; 939 F. Supp. at 992.

Like the district courts in <u>Defenders of Wildlife</u> and <u>Strahan</u>, the district court in this case has available a wide range of effective injunctive relief. Neither the appellate court in <u>Defenders of Wildlife</u> nor the appellate court in <u>Strahan</u> found any of that relief unconstitutional. Nor does that relief serve as an exhaustive list. For example, in this case, the district court could strike Volusia County's ordained exemption of Daytona Beach and Daytona Beach Shores from the Minimum Environmental Standards for Sea Turtle Protection as contained within Ordinance 89-60, as amended. <u>Cf.</u> <u>Hershey v. City of Clearwater</u>, 834 F.2d 937, 939 (11th Cir. 1987) ("The law permits us to strike the words 'or sleep,' if unconstitutional, from the ordinance."). Similarly, the district court could declare that those minimum standards, even if fully enforced, fail to prevent "harm" to protected sea turtles in Ormond Beach and New Smyrna Beach and -- like the district court in <u>Strahan</u> -- order Volusia County to form a committee and propose a solution. <u>See</u> <u>Franklin v. Massachusetts</u>, 505 U.S. 788, 803 (1992) (concluding that Massachusett's alleged injury, losing a seat in the House of Representatives, was "likely to be redressed by declaratory relief against the Secretary [of Commerce] alone" even though the Secretary "cannot herself change the reapportionment") (plurality); <u>Strahan</u>, 127 F.3d at 158; 939 F. Supp. at 992.[27] Finding no binding or persuasive authority to the contrary, we hold that the Turtles' alleged "harm" in Daytona Beach, Daytona Beach Shores, Ormond Beach and New Smyrna Beach can be constitutionally redressed through relief that respects the scope of Volusia County's regulatory control over those municipalities.

**C.**

---

[27] Those are just examples. We leave it to the district court to fashion appropriate injunctive relief if it finds Volusia County liable for sea turtle "harm" in any of the municipalities at issue.

44

Where, as here, a responsive pleading to the original complaint has been filed, "a party may amend the party's pleading only by leave of court . . . and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a) (emphasis added). Similarly, "[p]arties may be . . . added by order of the court on motion of any party . . . at any stage of the action and on such terms as are just." Fed. R. Civ. P. 21. (emphasis added). Technically, the Turtles sought leave to add a party, the leatherback sea turtle. See, e.g., American Bald Eagle v. Bhatti, 9 F.3d 163, 164 (1st Cir. 1993) (stating that the threatened bald eagle "brought this action to enjoin [a] . . . deer hunt"); Palila v. Hawaii Dep't of Land & Natural Resources, 852 F.2d 1106, 1107 (9th Cir. 1988) (stating that the endangered palila "has legal status and wings its way into federal court as a plaintiff in its own right").[28] In substance, however, the Turtles sought to allege additional takes. In any event, given the posture of this case, we agree with the district court that the standard for deciding the Turtles' motion for leave to file an amended complaint was the same under either rule 15(a) or 21. Accord Sosa v. Airprint Systems, Inc., 133 F.3d 1417, 1418 (11th Cir. 1998) (discussing rule 15(a)'s applicability to plaintiff's motion to amend the complaint to add a second defendant outside the scheduling order's prescribed time period). As such,

> [i]n the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be "freely given."

Foman v. Davis, 371 U.S. 178, 182 (1962).

We conclude that the district court's "apparent or declared reason" for denying leave to the Turtles failed to serve the interest of justice. First, the district court erroneously concluded

---

[28] The Service added the leatherback sea turtle to the endangered species list in June 1970. 50 C.F.R. § 17.11(h).

45

that the Turtles failed to invoke subject matter jurisdiction. The factual premise to the conclusion -- that a copy of their notice of intent to sue letter was not "on file with the Court" -- was false. The record contains at least two copies of the letter.

Volusia County argues that, even if the district court had found the letter in the record, it insufficiently provided "notice of the violation" to the Secretary of the Interior and Volusia County. 16 U.S.C. § 1540(g)(2)(A)(i). We disagree. In its first paragraph, the letter expresses the need for "immediate action . . . to eliminate . . . artificial beachfront lighting sources that take protected sea turtles during turtle nesting season (May 1st through October 31st)[.]" (Emphasis added.) In the next paragraph, the letter explicitly references the leatherback sea turtle as one of three species of sea turtles that nest on Volusia County beaches. Contrary to Volusia County's interpretation, the letter's "violations" section is not facially inconsistent with the letter's general prayer in the first paragraph. That section avers that, as of March 23, 1995, the individual appellants possessed evidence of "at least 33 independent violations of the ESA" that involve "the 'take' of loggerhead and green sea turtles[.]" (Emphasis added). When read in context, the exclusive reference to the loggerhead and green sea turtles in the violations section of the letter does not exclude the possibility of "continuing, forceable violations of the ESA" involving the leatherback sea turtle. Notice of Intent to Sue at 7. Thus, although the leatherback sea turtle "was referenced in only one part of the letter, the letter as a whole provided notice sufficient to afford the opportunity to rectify the asserted ESA violations." Marbled Murrelet v. Babbitt, 83 F.3d 1068, 1073 (9th Cir. 1996).[29]

_____

[29] Volusia County obviously knew of its potential problems with the leatherback sea turtle since it included that reptile and other species in its application for an incidental take permit. See Notice of Receipt of an Application for an Incidental Take Permit, 61 Fed. Reg. 9716 (March 11, 1996) (summarizing Volusia County's application for an incidental take permit that "would authorize the take of five species of sea turtles (loggerhead sea turtle, . . . green sea

The second basis of the district court's order, the Turtles' undue delay, is equally flawed. One of the two exhibits attached to the Turtles' motion for leave to amend is dated "June 1995." The Turtles filed their original complaint and motion for preliminary injunction on June 8, 1995. We have no reason to doubt the Turtles' lawyer's representation that they did not obtain this publication until after the filing of their original complaint. Thus, this is not a case where the facts supporting the proposed amendment "were known at the time of the original [pleading]." National Serv. Indus. v. Vafla Corp., 694 F.2d 246, 249 (11th Cir. 1982); cf. Palila, 852 F.2d at 1107 (noting the six-year gap between the original complaint and the amended complaint to add allegations of a new source of "harm" that "had not been the target of the original complaint because research . . . had not been completed"). Nonetheless, Volusia County insists that the Turtles must have known of the existence of leatherback sea turtles in March 1995, the date of their intent to sue letter. The district court, however, relied on no such factor. Additionally, the Turtles' failure to plead in their original complaint the existence of the leatherback sea turtle on Volusia County's beaches reconciles with their obligations under the federal rules and general notions of fair dealing. Allegations in a complaint must have "evidentiary support" to the best of the party's "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances." Fed. R. Civ. P. 11(b)(3) (filing a pleading warrants, among other things, that its "allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery"); Business Guides, Inc. v. Chromatic Communications Enterprises,

---

turtle, . . . leatherback sea turtle, . . . hawksbill sea turtle, . . .and Kemp's ridley sea turtle . . . ) and piping plovers . . . resulting from public beach-driving activity and lighting controlled and operated by Volusia County, to the extent that minimization and mitigation measures proposed in the habitat conservation plan . . . are not successful") (scientific names omitted and emphasis added).

47

498 U.S. 533, 541 (1991) ("A party who signs a pleading or other paper without first conducting a reasonable inquiry shall be sanctioned."). Assuming the author acts in good faith, an investigation preceding an intent to sue letter need not be as thorough as that leading up to the complaint. See Fed. R. Civ. P. 11(b) ("evidentiary support" and "reasonable inquiry" requirements apply only to papers "present[ed] to the court"); Chambers v. NASCO, Inc., 501 U.S. 32, 40, 46 (1991) (affirming the sanctioning of pre-litigation conduct -- commencing from "the time that plaintiff gave notice of its intention to file suit" -- based on the court's "inherent power to impose sanctions for . . . bad-faith conduct") (emphasis added).

We recognize that in late July 1995 the Turtles submitted, in support of their motion for preliminary injunction, the very same exhibit that it relied upon as factual support for their proposed amended complaint. It is undisputed, however, that the Turtles, in contrast to the plaintiff in Sosa, filed their motion for leave to amend within the time period prescribed in the district court's scheduling order. See 133 F.3d at 1419. At most, their failure to request leave to file an amended complaint in late July instead of October supports a finding of "delay," not "undue delay" or "dilatory" action. Foman, 371 U.S. at 182 (emphasis added). Nothing in the record suggests that this gap was anything other than "[t]he mere passage of time." Floyd v. Eastern Airlines, Inc., 872 F.2d 1462, 1490 (11th Cir. 1989), rev'd on other grounds, 499 U.S. 530 (1991).

The district court's final basis for denying leave, prejudice to Volusia County, constituted anything but "a substantial reason . . to deny leave to amend[.]" Florida Power & Light Co. v. Allis Chalmers Corp., 85 F.3d 1514, 1520 (11th Cir. 1996) (internal quotation marks and citations omitted). The district court reasoned that "[t]he impact of adding the leatherback [sea] turtle as a party, with its earlier breeding season, would be to foreclose the County's opportunity

48

to litigate whether takes of sea turtles occurred during the period from February to April, since the Court would be asked to preliminarily enjoin the County from allowing driving on the beach from February to October."[30]  As the Turtles correctly point out, however, they did not ask for preliminary injunctive relief as to the leatherback sea turtle.  Even if they would have requested such relief in the same or separate motion, the district court could have easily severed the issue of whether to grant preliminary injunctive relief from the issue of whether to grant leave to amend the complaint.[31]

The only purported prejudice we are left with is Volusia County's fear of incurring "additional expense and possible delay."  Any amendment to an original pleading necessarily involves some additional expense to the opposing party.  In this case, it is of nominal proportions.  In accordance with the district court's scheduling order, discovery proceeded on the assumption that the leatherback sea turtle would be added as a party.  Cf. Hargett v. Valley Fed. Sav. Bank, 60 F.3d 754, 761 (11th Cir. 1995) (affirming the denial of plaintiff's motion for leave to amend "which was filed more than eight months after the pretrial order was entered and almost ten months after [a discovery] deposition").  As to possible delay, Volusia County could not plausibly convince us that it genuinely wanted to go to trial as quickly as possible.  On the contrary, it employed extraordinary efforts to obtain continuance orders.  Volusia County

---

[30]  According to the proposed amended complaint, leatherback sea turtles nest and hatch from February 1 until October 31 annually, whereas loggerhead and green sea turtles nest and hatch from May 1 until October 31 annually.

[31]  Additionally, as a practical consideration, this basis for denial of leave is now moot because the district court dissolved the preliminary injunction and the incidental take permit authorizes takes of leatherback sea turtles through beach driving, even those occurring before May 1.

representatives even met personally with the Secretary of the Interior to ensure the imminence of the Service's incidental take permit decision.

We are mindful that "[t]he decision whether to grant leave to amend is within the sound discretion of the trial court." Jameson v. Arrow Co., 75 F.3d 1528, 1534 (11th. Cir. 1996) (affirming the denial of leave to amend to a plaintiff who requested it "ten months after she retained counsel, discovery was closed, the complaint had been amended twice, and [the defendant] had filed two motions for summary judgment"). Reversal is inherently rare. Based on the circumstances of this case, however, we hold that the district court's denial of leave to amend the original complaint fell outside the permissible range of discretion. Accordingly, the interest of "justice so requires" that the leatherback sea turtle be included in further proceedings on remand. Fed. R. Civ. P. 15(a).[32]

## V. CONCLUSION

For the foregoing reasons, the Turtles have convinced us to reverse the judgment of the district court. In summary, we first hold that Volusia County's incidental take permit does not authorize it to take protected sea turtles through purely mitigatory measures associated with artificial beachfront lighting.

---

[32] The Turtles allude to the fact that their amended complaint also sought to include washed-back sea turtles (hatchlings that initially reach the ocean but the surf subsequently washes ashore) as victims of beach driving. Of course, adding washed-back turtles to their claim at this juncture would be moot in light of the incidental take permit that expressly covers such takes. The same is true of leatherback sea turtles and beach driving. The incidental take permit expressly excepts incidental takes of leatherback sea turtles through beach driving, including incidental takes occurring prior to May 1 of each year. Finally, unlike the district court, we do not construe the Turtles' proposed amended complaint as seeking to expand the relevant nesting period beyond October 31 of each year. Rather, the Turtles' one-time reference to "December 31" appears to be a scrivener's error since their prayer for permanent injunctive relief states "October 31."

50

Second, we hold that the Turtles have standing to sue Volusia County under the ESA's "take" prohibition for its regulatory actions affecting light users in Ormond Beach and New Smyrna Beach (that is, the imposition of the Minimum Environmental Standards for Sea Turtle Protection as contained within Ordinance 89-60, as amended), but not those municipalities' independent enforcement efforts. We likewise hold that the Turtles have standing to sue Volusia County for its regulatory actions affecting light users in Daytona Beach and Daytona Beach Shores (that is, the exemption from the Minimum Environmental Standards for Sea Turtle Protection as contained within Ordinance 89-60, as amended). Furthermore, we hold that the district court possesses the power to fashion a remedy that both constitutionally redresses the alleged "harm" and respects the scope of Volusia County's regulatory authority within those four municipalities.

Finally, we hold that the district court abused its discretion in denying the Turtles' motion for leave to amend its original complaint and add the endangered leatherback sea turtle as a party. In light of the foregoing holdings, we remand this case for further proceedings consistent with this opinion, including a trial on artificial beachfront lighting (absent the timely intervening issuance of an incidental take permit).

**REVERSED and REMANDED.**

RONEY, Senior Circuit Judge, dissenting:

I respectfully dissent, largely on the reasoning of the district court Order deciding that the issuance by the Department of the Interior's U. S. Fish and Wildlife Service of an Incidental Take Permit renders this case moot. I understand the technical points and reasoning that argue for a contrary conclusion, but sometimes it is important to step back and view the fabric as a whole, especially when considering important conservation issues Congress committed to the expertise of an administrative agency.

The issues concerning the endangered turtles, of course, are not moot. The very fact they are covered by the Act reflects that serious measures must be taken in order to preserve the species. It is important that there be efficient and effective measures to protect all endangered turtles, but Congress has wisely assigned to the Department of the Interior extensive responsibilities under the Endangered Species Act. *See Babbitt v. Sweet Home Chapter, Communities for Great Oregon,* 515 U.S. 687, 708 (1995) ("When it enacted the ESA, Congress delegated broad administrative and interpretive power to the Secretary."). Along with these responsibilities comes the power to permit incidental "takes" as long as those takes do not threaten the continued existence of the species. *See* 16 U.S.C. § 1539(a) (1994). "The permit process requires the applicant to prepare a 'conservation plan' that specifies how he intends to 'minimize and mitigate' the 'impact' of his activity on endangered and threatened species, 16

52

U.S.C. § 1539(a)(2)(A)." *Sweet Home*, 515 U.S. at 700. It does not make sense to litigate in federal court the issue of incidental takes caused by artificial lights when those lights are regulated by the conservation plan provisions of a valid Incidental Take Permit. *Compare National Ass'n of Home Builders v. Babbitt*, 130 F.3d 1041, 1044-45 (D.C. Cir. 1977), *cert. denied*, 118 S. Ct. 2340 (1998) (when incidental take permit holder proposes to violate conservation plan, new take permit may be required).

As I understand it, there are two kinds of takings involved here. Baby turtles born at night crawl to the light, nature having made that light the reflection of the moon on the water. Artificial shoreline lighting and vehicular lighting disorients these turtles and instead of crawling to the water, they crawl away from the water. One kind of taking as a result is undisputed: the killing of the turtles by motor vehicles driving on the beach during this period. The plaintiffs concede that the Permit covers the incidental taking that occurs by motor vehicles as a result of the disorientation from artificial shoreline lights, as well as lights on the vehicles themselves.

Whether there is any taking due to shoreline artificial lights other than by vehicles is in dispute. The U. S. Fish and Wildlife Service has implemented an Artificial Beachfront Lighting Management Plan, however, which is designed to modify to the extent practical the lighting that disorients turtles during the critical nesting periods. This plan requires a detailed survey of artificial beachfront lights and contemplates more restrictive lighting regulations in the near future, all under the direct supervision of the U. S. Fish and Wildlife Service.

The Endangered Species Act authorizes the Department of the Interior to permit incidental "takes." The language focuses on the incidental takes themselves, rather than the activity that actually causes the takes. 16 U.S.C. § 1539(a)(1)(B). I would agree with the Ninth Circuit's reasoning that where incidental takes are "clearly contemplated by the incidental take

53

statement," they are excepted from liability under the Endangered Species Act. *Ramsey v. Kantor*, 96 F.3d 434, 442 (9th Cir. 1996). *See also Hamilton v. City of Austin*, ___ F. Supp. ___, (W.D. Tex. June 16, 1998) (incidental take permit not required where valid scientific permit to take endangered salamander had been granted by U.S. Fish and Wildlife Service).

The Pemit includes not only the two plaintiff turtle species, but the leatherback turtle, which plaintiffs sought to include as a party plaintiff, and two other species of turtles as well. It requires Volusia County to work with experts from the U. S. Fish and Wildlife Service, the Florida Department of Environmental Protection, the local lighting company, and even the municipalities of Daytona Beach and Daytona Beach Shores.

The conservation plan approved by the U. S. Fish and Wildlife Service requires Volusia County within one year to conduct an extensive survey of all artificial lights along its beachfronts and document any problems that might be caused by those lights. It requires Volusia County over the following two years to correct any of those problems. Only then, if it proves impractical or cost prohibitive to correct any remaining problems, might the issuance of an Incidental Take Permit be necessary.

Common sense would dictate that the Agency would not implement such a plan if it did not permit such incidental taking as might occur during the management plan, if any, in addition to the taking through vehicular activity. If the agency does not properly protect the interests here involved under the statute, the parties have a remedy through the Administrative Procedures Act. In my judgment, it is a serious mistake, a waste of government resources, and an unjust expense to the parties to try to run parallel litigation of these issues in the district court while the problem is under the management of the federal agency.

Even if this case were not moot, I would invoke the primary jurisdiction doctrine and stay the case pending further administrative proceedings before the U.S. Fish and Wildlife Service. The primary jurisdiction doctrine is a flexible tool that is designed to allocate efficiently fact finding between the federal courts and administrative agencies. *See United States v. Western Pac. R. Co.*, 352 U.S. 59, 63-64 (1956). The doctrine is "applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a 'referral' to the agency. . . . Referral of the issue to the administrative agency does not deprive the court of jurisdiction; it has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." *Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993).

This case involves a question of fact–whether artificial beachfront lighting "takes" sea turtles–that is not only within the special competence of the U. S. Fish and Wildlife Service, but is actually being reviewed by that agency. The Incidental Take Permit requires Volusia County to provide the U. S. Fish and Wildlife Service with information regarding lights which potentially disorient turtles and, if necessary, develop an appropriate mitigation plan. If the U.S. Fish and Wildlife Service determines that artificial beachfront lighting does indeed "take" turtles but does not threaten the continued existence of the species, then it is empowered by statute to craft a flexible solution to the problem of incidental takes. In this case, the U. S. Fish and Wildlife Service has already issued an Incidental Take Permit that comprehensively regulates artificial beachfront lighting. Invoking the primary jurisdiction doctrine would avoid a judicial solution that might conflict with the regulatory scheme already approved by the appropriate administrative agency. *See Friends of Santa Fe County v. LAC Minerals, Inc.*, 892 F. Supp. 1333, 1350 (D.N.M. 1995).+ Considering the statutory responsibilities given to the Secretary of

the Interior Department by Congress when it passed the ESA, I would hold in this case that the U. S. Fish and Wildlife Service is in a better position than a federal court to resolve the dispute at this time.

In any event, there seems to be no question that the district court case is moot if the Incidental Take Permit includes, in addition to takings by motor vehicles, such other takings, if any, caused by artificial lights. If that issue is indeed in doubt, this Court could simply require a stay of the district court proceedings while the defendant repairs to the Agency to get a clarification on that point.